Todd M. Schneider (SBN 158253)
Matthew S. Weiler (SBN 236052)
Sunny S. Sarkis (SBN 258073)
**SCHNEIDER WALLACE**
**COTTRELL KONECKY LLP**
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Telephone: (415) 421-7100
TSchneider@schneiderwallace.com
MWeiler@schneiderwallace.com
SSarkis@schneiderwallace.com

Jason H. Kim (SBN 220279)
**SCHNEIDER WALLACE**
**COTTRELL KONECKY LLP**
300 S. Grand Ave., Suite 2700
Los Angeles, California 90071
Telephone: (415) 421-7100
JKim@schneiderwallace.com

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MARK YOUNG, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SOLANA LABS, INC.; THE SOLANA FOUNDATION; ANATOLY YAKOVENKO; MULTICOIN CAPITAL MANAGEMENT LLC; KYLE SAMANI,<br><br>Defendants. | Case No. 3:22-cv-03912-RFL<br><br>CLASS ACTION<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

**TABLE OF CONTENTS**

I. INTRODUCTION ..... 1

II. PARTIES ..... 4

III. JURISDICTION AND VENUE ..... 4

IV. FACTUAL ALLEGATIONS ..... 6

A. Background of Crypto-Assets and ICP's Initial Coin Offering ..... 6

B. SOL's Genesis and Public Offerings ..... 8

C. Control of Solana's Blockchain Network Is Highly Centralized ..... 10

D. Defendants Sold and Solicited the Sales of SOL Securities ..... 11

E. SOL Is a Security ..... 23

F. Plaintiff and the Other Class Members Have Suffered Significant Damages from Defendants' Actions ..... 32

V. CLASS ALLEGATIONS ..... 33

VI. CAUSES OF ACTION ..... 35

VII. PRAYER FOR RELIEF ..... 37

VIII. PLAINTIFF'S DEMAND FOR JURY TRIAL ..... 38

Plaintiff Mark Young ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following against Defendants Solana Labs, Inc., the Solana Foundation, Anatoly Yakovenko, Multicoin Capital Management LLC, and Kyle Samani (collectively, "Defendants"), based on personal knowledge, the investigation of counsel, and information and belief.

## I.    INTRODUCTION

1.    This is a class action on behalf of all investors who purchased Solana tokens ("SOL securities"), which are unregistered securities, issued and sold by Defendants beginning on March 24, 2020, through the present (the "Class Period"). Defendants made enormous profits through the sale of SOL securities to retail investors in the United States, in violation of the registration provisions of federal and state securities laws, and the investors have suffered enormous losses.

2.    In 2017, Anatoly Yakovenko ("Yakovenko") founded Solana Labs. Solana Labs created "Solana," which is a blockchain network upon which decentralized apps ("dApps") are built. Such decentralized apps include the development of non-fungible tokens ("NFTs") and decentralized finance ("DeFi") applications. In 2021, there was a significant increase of NFTs that were "minted" on Solana's blockchain.

3.    Solana Labs takes its name from Solana Beach, a California beach where Yakovenko, Greg Fitzgerald, and Stephen Akridge (two other Californians) created the companies that were precursors to Solana (after having worked together at San Diego's Qualcomm).

4.    In March 2020, Solana Labs had its first public sale of SOL tokens in a "Dutch Auction," which was tantamount to an Initial Coin Offering ("ICO"). Between March and April 2020, SOL securities began publicly trading and have been offered on exchanges based in the United States since then.

5.    Since April 2020, funded by the proceeds they made through their ICO, Defendants have spent vast sums of money promoting SOL securities throughout the United States. As a result of these aggressive promotional efforts, SOL securities reached a peak price of $258 per token, with a market capitalization of more than $77 billion, on November 5, 2021. These persistent promotional

efforts took SOL securities from a relatively obscure crypto-asset to one of the top crypto-assets in the world.

6. During the Class Period, Defendants have made deliberately misleading statements concerning the total circulating supply of SOL securities. For example, on April 28, 2020, Yakovenko, published a written statement noting that the oversupply of tokens was the result of Solana Foundation agreeing to lend a market maker 11,365,067 tokens for a six-month period.[1] Yakovenko admitted: "[Solana] did not disclose this information to the public, as well as the size and nature of the loan, during the CoinList auction and subsequent Binance listing." Yakovenko further stated that "we plan to reduce the circulating supply by removing the 11,365,067 supply from the market within the next 30 days. After removing the supply, we aim to burn the tokens."

7. This did not happen. Instead, Solana "only recalled about 3.3 million tokens and the rest hit the market."[2]

8. The value of SOL securities has been tied to the perceived strength and reliability of its underlying blockchain. Indeed, Solana made such representations to the public regarding the purported strength and reliability of its blockchain network. Solana's website asserts that SOL is "decentralized and unstoppable."

9. The more decentralized a blockchain is, the less it relies on a central point of control. On April 28, 2020, Yakovenko represented that such decentralization is desirable as a public good:

> The Solana Foundation was founded with a mission to advance the adoption of decentralized technologies as a public good. The vision of a world where individuals are empowered to retain ownership of their data and can access networks through which they transfer value without being reliant on third-parties.[3]

---

[1] Anatoly Yakovenk, *Solana Will Reduce Its Token Supply to Account for Market Making Allocation*, Medium (Apr. 28, 2020), https://medium.com/solana-labs/solana-will-reduce-its-token-supply-to-account-for-market-making-allocation-b8366288acef.

[2] Steve Msoh, *Solana Gains 33% to Shoot Past Cardano and Tether – but a 12M SOL Cover-up Haunts the Project*, CRYPTO NEWS FLASH (Nov. 7, 2021), https://www.crypto-news-flash.com/solana-gains-33-to-shoot-past-cardano-and-tether-but-a-12m-sol-cover-up-haunts-the-project/.

[3] Anatoly Yakovenko, *Announcing the Formation of the Solana Foundation*, MEDIUM (June 7, 2020), https://medium.com/solana-labs/announcing-the-formation-of-the-solana-foundation-afde417afd73.

10.     Contrary to Defendants' public representations, however, SOL is not decentralized, because company insiders hold a substantial percentage of them. As of May 2021, insiders held 48% of the SOL supply.[4] The network is thus highly centralized.

11.     Solana's blockchain network is also prone to devastating outages. For example, in December 2020, the Solana network was out for five (5) hours. In September 2021, the Solana network was out for eighteen (18) hours. After the latter outage, Solana had to restart its blockchain. Solana experienced fourteen (14) serious outages in 2022, with the June 1, 2022, outage causing a 12% dip in value to SOL securities.[5]   As recently as February 25, 2023, the Solana network was down for eighteen (18) hours and fifty (50) minutes, the longest in over a year.[6] These outages have, and continue to, result in major losses for network users and have also caused the trading value of SOL to fall dramatically.

12.     The Solana blockchain network is also prone to network congestion further degrading the reliability of the blockchain network. In January 2022, high network congestion on the Solana network caused DeFi users to have their positions liquidated.[7]

13.     Multicoin Capital Management LLC ("Multicoin") and Kyle Samani ("Samani") (collectively, the "Multicoin Defendants") relentlessly promoted SOL securities after purchasing them for $0.40 in 2019, when Multicoin led Solana's "Series A" offering. Samani and Multicoin continuously flogged SOL securities, inflating its market price from below a dollar to hundreds of dollars, persisting in their promotional efforts even after it was clear that Solana had serious outage and technical issues.

---

[4] Timothy Craig, *How Decentralized is Solana?*, CRYPTO BRIEFING (Oct. 16, 2021), https://cryptobriefing.com/how-decentralized-is-solana/.

[5] Georgia Butler, *Solana Cryptocurrency Has Second Outage in a Month, Causing 12 Percent Dip in Value*, DCD (June 6, 2022), https://www.datacenterdynamics.com/en/news/solana-cryptocurrency-has-second-outage-in-a-month-causing-12-percent-dip-in-value/.

[6] Samuel Wan, *Here's Why the Recent Solana Outage Took Almost a Day to Resolve*, CRYPTOSLATE (Feb. 27, 2023), https://cryptoslate.com/heres-why-the-recent-solana-outage-took-almost-a-day-to-resolve/#:~:text=Solana's%20uptime%20status%20showed%20the,3%20minor%2C%20outages%20in%202022.

[7] Joanna Ossinger, *Solana Suffers Network Instability in Brutal Week for Crypto*, BLOOMBERG (January 23, 2022), https://www.bloomberg.com/news/articles/2022-01-23/solana-suffers-network-instability-during-brutal-week-for-crypto#xj4y7vzkg.

14.     The Multicoin Defendants then offloaded millions of dollars of SOL securities on retail investors, such as Plaintiff, and profited handsomely from their promotion of unregistered SOL securities. To offload their SOL securities, they have used OTC trading desks such as FalconX to act as a broker for the sale of substantial sums of SOL securities.

## II.     PARTIES

15.     Plaintiff Mark Young is an individual who resides in California. He purchased SOL securities in August and September 2021 from California.

16.     Defendant Solana Labs, Inc. ("Solana Labs") is a Delaware corporation having a principal place of business at 645 Howard Street, San Francisco, California 94105.

17.     Defendant Solana Foundation is a non-profit foundation having a principal place of business in Zug, Switzerland. The Solana Foundation develops core nodes on the blockchain network. The Solana Foundation also chooses validators for the Solana blockchain network.

18.     Defendant Anatoly Yakovenko is the CEO of Solana Labs and is a member of the Solana Foundation Council. He is a resident of the San Francisco Bay Area and has lived and worked in California since graduating from the University of Illinois at Urbana-Champaign in 2003.

19.     Defendant Multicoin Capital Management LLC ("Multicoin") is a limited liability corporation organized under the laws of Texas and has its main offices located at 501 West Avenue, Suite 3803, Austin, Texas 78701. Multicoin has a presence in Los Angeles, California. Multicoin's books and records are maintained in Mountainview, California, and in San Francisco. Multicoin serves customers in California and has close ties to California-based Solana.

20.     Defendant Kyle Samani is the Managing Partner of Multicoin and is a resident of the state of Texas. Samani regularly travels to California to conduct business related to Multicoin's investments in California-based companies such as Solana.

## III.     JURISDICTION AND VENUE

21.     Plaintiffs bring suit to recover damages and to obtain other relief from harm that he and others similarly situated have sustained due to Defendants' unregistered and unqualified offers and

sales of securities in violation of Sections 5, 12(a)(1), and 15 of the Securities Act, 15 U.S.C. §§ 77e, 77l, and 77o, and Sections 25110 and 25503 of the California Corporations Code.

22. This Court has subject matter jurisdiction over claims under the Securities Act pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1331, and supplemental jurisdiction over the entire action under 28 U.S.C. § 1367.

23. This Court has personal jurisdiction over Defendants under 15 U.S.C. §§ 77v and 78aa based on their acts occurring in or aimed at the United States in connection with Defendants' unregistered offers and sales of securities in violation of in violation of Sections 5, 12(a)(1), and 15 of the Securities Act, 15 U.S.C. §§ 77e, 77l, and 77o,

24. This Court has personal jurisdiction over Defendants based on their acts occurring in or aimed at the State of California in connection with Defendants' unregistered offers and sales of securities in violation of Sections 5, 12(a)(1), and 15 of the Securities Act, 15 U.S.C. §§ 77e, 77l, and 77o, and Sections 25110 and 25503 of the California Corporations Code.

25. This Court also has personal jurisdiction over Solana Labs because it resides in or has a principal place of business in California.

26. This Court has personal jurisdiction over Solana Foundation because Defendants Solana Labs and Yakovenko own and control Solana Foundation and direct the Solana Foundation's activities. Solana Foundation targeted investors in California, and other U.S. investors, with respect to all allegations herein.

27. This Court has personal jurisdiction over Yakovenko because he is a resident of California, and the activities alleged herein where undertaken when he was a resident of California.

28. This Court has personal jurisdiction over Multicoin because it resides in or has a principal place of business in Texas, thus, the United States, and the activities alleged herein where undertaken when it was a resident of the United States.

29. This Court has personal jurisdiction over Samani because he is a resident of Texas, thus the United States, and the activities alleged herein where undertaken when he was a resident of the United States.

30.     This Court also has personal jurisdiction over Multicoin and Samani because it arises out of their conduct directed at California residents, including their promotion of SOL securities to California residents, and their sale of SOL securities to California residents and on California-based cryptoasset exchanges, like Coinbase.

31.     Venue is proper in the United States District Court for the Northern District of California pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b) and (c).

## IV.     FACTUAL ALLEGATIONS

### A.     Background of Crypto-Assets and ICP's Initial Coin Offering

32.     A crypto-asset is a digital asset designed to work as a medium of exchange or a store of value or both. Crypto-assets leverage a variety of cryptographic principles to secure transactions, control the creation of additional units, and verify the transfer of the underlying digital assets.

33.     Created in 2009, Bitcoin was the world's first decentralized crypto-asset. With a current market capitalization of approximately $700 billion, Bitcoin is also the largest and most popular crypto-asset. Bitcoin spawned a market of other crypto-assets that, together with Bitcoin, has a current market capitalization of $1.48 trillion as of November 2023.

34.     One of the main features that Bitcoin popularized was the use of a distributed ledger to track the ownership and transfer of every bitcoin in existence. This distributed ledger is known as a "blockchain." Blockchains are a central technical commonality across most crypto-assets. While each blockchain may be subject to different technical rules and permissions based on the preferences of its creators, they are typically designed to achieve a form of decentralization.

35.     There are two main ways to obtain crypto-assets. One way is to be part of the framework of incentives to validate the transactions on the blockchain, under either a "Proof of Work" or "Proof of Stake" scheme. Users who expend resources to validate the blockchain are rewarded with newly minted tokens. This process is colloquially referred to as "mining" for Proof of Work blockchains, or "validating" for Proof of Stake blockchains.

36.     A second and typically more common way to obtain crypto-assets is to acquire them from someone else. This  involves acquiring them through online crypto-asset exchanges. These

exchanges are similar to traditional exchanges in that they provide a convenient marketplace to match buyers and sellers of virtual currencies.

37. Bitcoin, for a time, was the only crypto-asset available on exchanges. As crypto-assets grew in popularity, however, other exchanges began listing other crypto-assets as well and trading volumes expanded. In early 2013, daily Bitcoin trading volumes hovered between $1 million and $25 million. By the end of 2017, however, daily Bitcoin trading volumes ranged between $200 million and $3.8 billion.

38. Ethereum is the second-most popular crypto-asset, with a market capitalization of approximately $240.3 billion as of November 2023. Ethereum was designed to enable "smart contract" functionality. A "smart contract" is a program that verifies and enforces the negotiation or performance of a contract. Smart contracts can be self-executing and self-enforcing, which theoretically reduces the transaction costs associated with traditional contracting.

39. For example, a smart contract enables two parties to submit ether to a secure destination and automatically distribute the Ether at the end of the month without any third-party action. The smart contract self-executes with instructions written in its code which get executed when the specified conditions are met. Since Ethereum first introduced the concept of smart contracts, many other companies have sought to create crypto-assets that improve on and compete with Ethereum in the smart contract ecosystem.

40. Interest in crypto-assets began to accelerate towards the end of 2016, with prices growing at a historically unprecedented rate for any asset class. Over the course of 2017 alone, Bitcoin's price increased from approximately $1,000 to approximately $20,000. On January 1, 2017, Ethereum was trading at approximately $8 per Ether. Approximately one (1) year later, it was trading at over $1,400 per ether—a return of approximately 17,000 percent over that period.

41. This enthusiasm for crypto-assets prompted many entrepreneurs to raise funds through "Initial Coin Offerings," or ICOs. Often, as with Internet Computer token offerings ("ICP"), these entrepreneurs would promise investors that funds raised during an ICO would go to fund a new blockchain—commonly touted as revolutionary in some way—and that tokens obtained at the ICO

would be used on that new blockchain. Between 2017 and 2018, ICOs raised nearly $20 billion. None of these ICOs was registered with the SEC.

**B.      SOL's Genesis and Public Offerings**

42.      Solana Labs claimed that the inspiration for Solana came from witnessing scalability issues related to other blockchain systems, such as Bitcoin, which processed a paltry 4.6 transactions per second as recent as 2019.[8] Indeed, commentators note that the "battle for a scalable solution is the blockchain's moon race."[9] Whereas Bitcoin has struggled to scale beyond fifteen (15) transactions per second, Yakovenko claimed that the Solana blockchain could process hundreds of thousands of transactions per second. For comparison, Visa processes 1,700 transactions per second.

43.      Yakovenko turned to his colleague from Qualcomm, Greg Fitzgerald, to revamp the codebase of what would become Solana. The goal was "to weave all the world's transactions together on a single, scalable blockchain."[10]

44.      To fund its creation, Yakovenko, through Solana Labs, raised private funding in multiple rounds. It raised funds by selling SOL securities.

45.      SOL is a crypto-asset that is created and minted on Solana, the Solana Labs' blockchain network.

46.      In an April 2018 "Seed Sale," Solana Labs sold the future rights to 79,290,466 SOL securities (~15% of initial supply) for the equivalent of $3.17 million ($0.04/token).

47.      On May 21, 2018, Solana Labs filed a Form D (Notice of Exempt Offering of Securities) with the SEC in connection with the Seed Sale, indicating sale of securities exempt from registration under Rule 506(c). An amended Form D was later filed in August 2018.

48.      In a June 2018 "Founding Sale," Solana Labs then sold 63,151,982 tokens (~12% of the initial supply) for the equivalent of $12.6 million ($0.20/token). Multicoin was the lead investor in this round, which also saw participation from Distributed Global, BlockTower Capital, Foundation

---

[8] Kenny, *The Blockchain Scalability Problem & the Race for Visa-Like Transaction Speed*, MEDIUM (Jan. 30, 2019), https://towardsdatascience.com/the-blockchain-scalability-problem-the-race-for-visa-like-transaction-speed-5cce48f9d44.
[9] *Id.*
[10] Solana, *History*, SOLANA, https://docs.solana.com/history (last accessed Jan. 21, 2024).

Capital, Blockchange VC, Slow Ventures, NEO Global Capital, Passport Capital, and Rockaway Ventures. On June 21, 2018, Solana Labs filed a Form D with the SEC in connection with the Founding Sale.

49.     Nearly all of Solana's advisors and early investors are U.S.-based companies. Multicoin is based in Austin, Texas; Distributed Global is based in Los Angeles; BlockTower Capital is in Stamford, Connecticut; Foundation Capital is based in Palo Alto and San Francisco; Blockchange is in New York; Slow Ventures is in San Francisco and Boston; Passport Capital is in San Francisco.

50.     In a July 2019 "Validator Sale," Solana Labs sold 25,331,653 SOL securities (~5% of the initial supply) for the equivalent of $5.7 million ($0.225/token) to individuals and companies planning to run Solana validators. On July 31, 2019, Solana Labs filed a Form D with the SEC in connection with the Validator Sale.

51.     In a February 2020 "Strategic Sale," Solana Labs sold 9,175,520 SOL securities (~1.8% of supply) for the equivalent of $2.3 million ($0.25/token).

52.     On March 24, 2020, Solana first sold SOL securities publicly through a Dutch auction on the platform CoinList (coinlist.co). In this auction, 8 million SOL securities were sold at a price of $0.22/token. CoinList's headquarters are in San Francisco.

53.     On April 8, 2020, Solana Labs transferred all IP related to the protocol and 167 million SOL to the Solana Foundation. This was *after* Solana Labs had released the SOL token through the "Dutch auction" in March 2020.

54.     Solana Labs raised an additional $314 million in a "private token sale" announced in June 2021. This funding round was led by Andreessen Horowitz and Polychain Capital with participation from 1kx, Alameda Research, Blockchange Ventures, CMS Holdings, Coinfund, CoinShares, Collab Currency, MGNR (Memetic Capital), Multicoin Capital, ParaFi Capital, Sino Global Capital, Jump Trading, and select individual investors like Boys Noize.

55.     Solana Labs used proceeds from the sale to launch an incubation studio alongside a venture investing arm and trading desk dedicated to the Solana ecosystem.

### C. Control of Solana's Blockchain Network Is Highly Centralized

1. Solana's Token Supply Is Highly Centralized

56. When ownership of the native token of a blockchain is highly centralized, it may permanently impair the blockchain's ability to become credibly neutral public infrastructure. This is because control over a blockchain's native token, like SOL, gives a group voting rights over the direction and development of the blockchain, much like ownership in shares of a company may confer certain voting rights.

57. Many blockchains overcome this dilemma by allocating a large percentage of their initial distribution to ICOs (*i.e.*, public offerings). Through this process, blockchains can quickly reach certain levels of decentralization to ensure those involved with the creation of the blockchain do not have *de facto* control over the blockchain itself.

58. Defendants deliberately chose to sell only a small amount of its token supply (less than 2%) in its 2020 ICO. Defendants did this to (1) ensure they had *de facto* control over the Solana blockchain and (2) to artificially drive down the available supply of SOL securities through coordination amongst themselves. Indeed, as of May 2021, 48% of SOL securities were owned by insiders such as Solana Labs and its team, and an additional 13% of SOL securities were owned by the Solana Foundation.

59. Because Solana Labs and its insiders directly control significantly more than 50% of the total SOL supply, the underlying value of SOL depends primarily on the efforts taken by Defendants.

2. Solana's Network Outages Show That Its Network Is Highly Centralized

60. On September 14, 2021, the Solana blockchain suffered a significant outage that saw transactions on the network halted for several hours. To address this issue, Defendants and their engineers unilaterally shut the entire Solana blockchain off for hours to address this issue.

61. After this outage, Defendants touted that they had addressed the bugs involved with the outage and represented that these types of issues would not happen in the future. For example, at a

conference in November 2021, Yakovenko promised that the bugs involved in the outage had been fixed by Solana Labs, and that Solana's network was "faster and more stable."

62. The blockchain was plagued with problems in January 2022, when it suffered service disruptions and degraded performance for nine (9) days out of the thirty-one (31) in the month.[11] Duplicate transactions were blamed for the second outage in January. In late April and early May 2022, Solana was down again for almost eight (8) hours due to nonfungible token minting bots overwhelming the network. On September 30, 2022, the network suffered an outage that lasted for six (6) hours and nineteen (19) minutes when the network was unable to recover from "a fork caused by a bug in the consensus algorithm implementation."[12] On February 25, 2023, the network suffered an outage that lasted eighteen (18) hours and fifty (50) minutes..

63. However, despite these statements, Defendants' efforts in addressing its network outages have been unsuccessful. As reported by Defendants own metrics,[13] in 2022 alone, the Solana network has suffered *twelve* (12) serious outages across its blockchain, including on June 1, 2022, when the network went down for over four hours, halting millions of user transactions during that period. According to the Solana uptime tracker, Solana faced 14 outages in 2022 leading to a total downtime of four (4) days, twelve (12) hours, and twenty-one (21) minutes.[14] And in February 25, 2023, the network suffered an outage of nearly nineteen (19) hours.

**D. Defendants Sold and Solicited the Sales of SOL Securities**

1. Solana Labs and Solana Foundation Sold SOL Securities

---

[11] Martin Young, *Reliably Unreliable: Solana Price Dives After Latest Network Outage*, COINTELEGRAPH (June 2, 2022) https://cointelegraph.com/news/reliably-unreliable-solana-price-dives-after-latest-network-outage.

[12] Solana Foundation, *Network Performance Report: October 2022*, SOLANA (Oct. 31, 2022), https://solana.com/news/network-performance-report-october-2022.

[13] Solana, *Uptime: Mainnet Beta Cluster*, https://status.solana.com/uptime?page=1 (last accessed January 12, 2024).

[14] Monika Ghosh, *How Solana is Fixing Outage, and the Challenges it will Tackel in 2023*, CRYPTOSLATE (Dec. 28, 2022), https://cryptoslate.com/how-solana-is-fixing-outages-and-the-challenges-it-will-tackle-in-2023/#:~:text=According%20to%20the%20Solana%20uptime,days%2012%20hours%2021%20minutes.

64.     In March 2020, Solana Labs and the Solana Foundation sold SOL securities in a public auction. After that auction, Solana Labs and the Solana Foundation continue to offer and sell SOL securities to retail investors.

65.     Some of these sales are reflected in a series of "Transparency Reports" that were issued by Solana Foundation during the second half of 2020. Notably (and conspicuously), the Solana Foundation ceased issuing transparency reports after December 2020.

66.     In its very first Report, dated June 16, 2020, Solana Foundation stated: "From May 2020 through the end of the year, the Solana Foundation is committed to introducing no more than [8,000,000 SOL] per month (separate from previously committed distributions) into the circulating supply through" means that included "[s]elling tokens through primary sales or through an auction on a non-exchange platform such as CoinList." Consistent with its representation, in subsequent Transparency Reports, Solana Labs and the Solana Foundation indicated that the Solana Foundation had, in fact, sold SOL securities to the public during the second half of 2020.

67.     For example, in the August 4, 2020, Report, Solana Labs and the Solana Foundation revealed that during July 2020: "[7,906,876 SOL] were distributed for development grants, previously announced partnerships, unannounced partnerships, and fundraising activities. This includes [3,797,012 SOL] for exchange-related activities, [500,010 SOL] for capital markets services, [3,000,000 SOL] for partnership-related grants and purchases, and [609,854 SOL] for exchange sales."

68.     The September 1, 2020, Report similarly revealed, in August 2020, "[7,947,544 SOL] were distributed for development grants, previously announced partnerships, unannounced partnerships, and fundraising activities. This includes [7,688,706 SOL] for capital markets services, and [35,801 SOL] for partnership-related grants."

69.     The October 1, 2020, Report likewise indicated that, in September 2020, "[7,938,706 SOL] were distributed for development grants, previously announced partnerships, unannounced partnerships, and fundraising activities."

70.     The November 1, 2020, Report reflected similar sales during October 2020, and the December 1, 2020, report indicated that the Solana Foundation anticipated that such sales would

continue in the month of December: "During the month of December, the Solana Foundation expects to release up to [8,000,000 SOL] into circulation for various community, partnership, grant, exchange, and fundraising activities."

71.    The transparency reports also provided data about the "circulating supply" of SOL securities and the "unlocking" schedule for restricted SOL securities. This data demonstrates that Solana Labs and the Solana Foundation have continued to sell SOL securities throughout 2021 and 2022.

72.    Defendants have used the term "circulating supply" to define "the number of [SOL] tokens that are currently "unlocked" and in accounts outside of the control of the Solana Foundation or Solana Labs.

73.    The term "unlocked" references SOL securities that are not subject to alienability restrictions and can thus be freely sold. SOL securities can, accordingly, be divided into three categories, which comprise the "total supply," as follows:

a.    Circulating Supply: SOL securities that are part of the "circulating supply." These securities are not owned by Solana (*i.e.*, they are "in accounts outside of the control of the Solana Foundation or Solana Labs") and may be freely sold.

b.    Solana Supply: SOL securities that are neither locked nor part of the "Circulating Supply." These securities are owned or controlled by Solana and may be freely sold. Once they are sold to the public, they become part of the "Circulating Supply."

c.    Locked Supply: SOL securities that are "locked" and thus may not be freely sold. As explained below, Solana's team members and founders held "locked" SOL securities which were gradually unlocked, and thus became part of the "Solana Supply" over time.

74.    According to the December 1, 2020, Transparency Report, as of January 7, 2021, the "Circulating Supply" of SOL securities was approximately 262 million, the "Solana Supply" was approximately 173 million, and the "Locked Supply" was approximately 58 million. Based on these numbers, the total supply of SOL securities as of January 7, 2021, was 493 million.

75.     With respect to the Locked Supply, the December 1, 2020, Report explained that the 58 million SOL securities that were "locked" as of January 7, 2021, would later become unlocked in accordance with the following schedule:

-*First*, an additional 26,457,560 SOL securities owned by "Employees and Service Providers" would become unlocked after January 7, 2021, in accordance with individualized "vesting schedules."

-*Second*, 31,250,000 SOL securities owned by Solana's "founders" would become unlocked on a monthly basis for the following twenty-four (24) month period. The "unlocking" described in this paragraph would have no bearing on the "total supply" of SOL securities. Instead, it would only serve to increase the Solana Supply and, to the extent SOL securities were sold after unlocked, the Circulating Supply.

76.     By May 6, 2021, according to data from CoinMarketCap, the Circulating Supply and total supply of SOL securities had remained relatively unchanged since January 2021. Specifically, the Circulating Supply had increased modestly to 273 million, and the total supply had increased to approximately 495 million.

77.     By December 31, 2021, however, data from CoinMarketCap demonstrates that the Circulating Supply had increased significantly, to over 309 million, while the total supply had increased to approximately 512 million. In other words, between May 6, 2021, and December 31, 2021, the Circulating Supply of SOL securities increased by approximately 36 million, while the total supply increased by only 17 million.

78.     By March 25, 2022, the Circulating Supply had increased further to approximately 323 million, or by 14 million since December 31, 2021. During that period, the total supply remained essentially constant at 512 million.

79.     These numbers make clear that, since at least May 6, 2021, the Circulating Supply of SOL securities has increased by significantly more than the total supply of SOL securities. Indeed, between May 6, 2021, and March 25, 2022, the Circulating Supply increased by 50 million, whereas the total supply had increased by only 17 million.

80. Accordingly, over this period, approximately 33 million SOL securities that were previously part of the Solana Supply or the Locked Supply, became part of the Circulating Supply. In other words, Solana Labs, Solana Foundation, and Yakovenko sold millions of SOL securities to the public between May 6, 2021 and March 25, 2022.

81. During this time, Solana Labs, Solana Foundation, and Yakovenko made hundreds of millions of dollars from the sale of SOL securities.

2. Solana Labs and Solana Foundation Solicit Sales

82. Since it first offered SOL securities to the public in March 2020, Solana Labs and Solana Foundation have continuously promoted the sale of such securities in public statements, in which they have repeatedly offered those securities for sale and solicited Plaintiff and other retail investors to purchase those securities.

83. In making such solicitations and offers, Solana Labs and Solana Foundation were motivated, at least in part, by their desire to serve their own financial interests. Indeed, as noted above, as of May 2021, 48% of SOL securities were owned by insiders such as Solana Labs and its team, and an additional 13% of SOL securities were owned by the Solana Foundation.

84. Moreover, to increase demand for SOL securities, as demonstrated below, Solana Labs and Solana Foundation ensured that SOL securities would be tradable on secondary markets, including the largest and best known crypto-asset exchanges in the United States and the world.

85. Solana Labs and Solana Foundation affirmatively acted to get these exchanges to agree to list SOL securities. For example, in mid-2021, Solana announced that SOL securities would be tradeable on Coinbase, a San Francisco-based crypto-asset exchange (and the largest crypto-asset exchange based in the United States). Under Coinbase's policy, for a crypto-asset to be listed on the exchange, the *issuer*—*i.e.*, Solana—must affirmatively apply. Today, hundreds of millions of dollars' worth of SOL securities are traded on Coinbase daily.

86. The following timeline of statements, though non-exhaustive, are representative of Solana Labs' and Solana Foundation's offers and solicitations made through their Twitter account, @solana:

| DATE | TWEET / STATMENT |
|---|---|
| March 24, 2020 | "The current price is 0.42 USDC with 6M SOL left." |
| April 7, 2020 | "Huge news was announced a few hours ago. $SOL will be actively tradeable on @binance starting Thursday at 12pm CST (China Standard Time)." |
| April 11, 2020 | "$SOL is the leading #btc trading pair on @binance right now." |
| June 15, 2020: | "We have seen over $2.6 million in trading volume since @hummingbot_io launched the Solana Liquidity Mining Campaign on May 26th. We decided to double the rewards to USDC 1,250 and this week's competition is now live. Get started with our easy setup guide . . . ." |
| July 7, 2020 | "The Solana Foundation is excited to share that the SOL token will be listed on MXC at 3 AM UTC on Wednesday, July 8th! The initial trading pairs will be SOL/BTC and SOL/USDT. TO thank our growing global community, Solana will be giving away 26,666.67." |
| July 11, 2020 | "The Solana Foundation is excited to share that SOL is now open for deposits on Bithumb Global; starting at 9 AM UTC on July 13th, 2020, SOL will begin trading. 💰 The Solana Foundation is offering 80,000 in prizes across three different events." |
| July 17, 2020 | The Solana Foundation is excited to share that SOL is now open for deposits on BitMax; starting at 2 PM UTC on July 20th, 2020, SOL/USDT will begin trading. 35,000 in prizes will be available across three different events." |
| July 25, 2020 | "SOL/USDT is officially trading on @gate_io." |
| July 26, 2020 | "The Solana Foundation is thrilled to announce that SOL is now open for deposits and trading on FTX. In addition to the usual airdrop rewards, the Solana Foundation will be picking one person to win a @Tesla Cybertruck." |
| September 8, 2020 | "Ledger hardware wallet now supports the Solana native token, $SOL." |
| September 16, 2020 | "The wallet options for SOL continue to grow 💰 . . . @SwipeWallet instant swap / buy SOL with a linked bank account." |

| | |
|---|---|
| September 17, 2020 | "The Solana community in the United States has been eagerly awaiting the chance to trade SOL on a US exchange, and now that day has come. SOL/USDT, SOL/USD, and SOL/BTC pairs are all open for trading on @ftx_us." |
| September 17, 2020 | "@BinanceUS announces Support for SOL, making it the Second US Exchange to list SOL within one day" |
| September 29, 2020 | @OKEx has listed SOL – deposits are now open, and trading starts on September 30th, at 10 AM UTC." |
| September 30, 2020 | "Less than 24 hours left to stake your SOL to be eligible for the 2000 SOL award pool. $SOL." |
| October 14, 2020 | "FTX is broadening its DeFi index to include $SOL, along with several other tokens!" |
| December 3, 2020 | "SOL deposits are now open on Huobi with trading beginning in a few hours!" |
| December 7, 2020 | "SOL has been listed on @Tokocrypto, with trading available now! . . . To celebrate this listing, Solana & Tokocrypto are running an Earn Campaign where you can win up to 500 SOL." |
| February 10, 2021 | "Staking rewards are now live on Solana Mainnet Beta. Congratulations to the entire Solana ecosystem for reaching this milestone in censorship resistance and decentralization. |
| February 10, 2021 | "SOL token holders can now earn rewards and help increase the security of the network by delegating tokens to a diverse set of validators through easy to use apps like [Solflare]." |
| February 20, 2021 | "@FTX_Official adds staking support for $SOL." |
| March 25, 2021 | "Today $40m in additional investment will flow into the Solana ecosystem to support the next generation of blockchain projects and ecosystem companies building on Solana." |
| May 20, 2021 (retweet from Coinbase) | "Starting today, inbound transfers for SOL are now available in the regions where trading is supported. Traders cannot place orders and no orders will be filled. Trading will begin on or after 9AM PT on Monday May 24, if liquidity conditions are met." The tweet linked to an article on Coinbase titled "Solana (SOL) is launching on Coinbase Pro." |

| | |
|---|---|
| July 24, 2021 | (retweet): "not sure everyone has realized this yet, but @solana now has . . . the industry's best wallet UX (@phantom) . . . [and] fiat on-ramps (FTX pay, moonpay, ramp, etc) . . . ." |
| August 18, 2021 | "Solana surpassed 400k Twitter followers! Thanks to all the builders, validators, token holders & ecosystem evangelists who have joined us in our mission to scale crypto globally. We are just getting started! 🚀 " (In the crypto-asset industry, the rocket ship emoji connotes a belief that the price of a particular digital asset is going to sharply increase.) |
| August 27, 2021 | "We're aware of some exchanges encountering some issues with deposits and withdrawals of Solana related assets due to the recent network upgrade and are working closely with exchanges to resolve this. We expect this to be resolved shortly." |
| March 17, 2022 | "Today Coinbase Wallet added support for Solana project tokens, with dapp connections and NFTs coming soon." |

a. The Multicoin Defendants Sold SOL Securities

87. Kyle Samani, as noted, is co-founder and managing partner of Multicoin. In April 2018, Samani was introduced to Yakovenko, when he was building a project named "Loom."

88. Multicoin led Solana's $20 million Series A funding round in July 2019. The Series A investors "received SOL tokens in exchange for their investment, not equity in Solana, Inc." Around the time the Series A was announced, Multicoin published an article touting Solana's technology as a "profound change relative to other [block]chains," claiming that "[i]n Solana, validators never stop progressing. They always move forward independently, regardless of network conditions and consensus."[15]

[15] Ryan Gentry, *The Separation of Time and State*, MULTICOIN CAPITAL (July 16, 2019), https://multicoin.capital/2019/07/16/the-separation-of-time-and-state/.

89.     Promoting Solana and the fundraising round, Mr. Samani stated: "Solana is the only chain that scales at Layer 1 while preserving architectural and political decentralization, ensuring that smart contracts retain the key properties of being composable and modular."[16]

90.     Samani and Multicoin are not passive Solana investors. As one publication reported:

> They were pretty intimately involved in every major turning point, every major decision, every funding round that we had, Solana co-founder Raj Gokal said of the firm. Multicoin felt like a third co-founder to me and Anatoly. Perhaps Multicoin's most impactful contribution was its orchestration of a partnership with Sam Bankman-Fried, who agreed to build a decentralized exchange on top of Solana. Not only did it bring Yakovenko's vision to life, but it brought Solana to the attention of the broader ecosystem, galvanizing its extraordinary 2021.[17]

91.     Samani himself explained that his efforts were integral in getting Solana Labs through difficult times during the first two quarters of 2020, "when Solana was both a) almost out of money b) irrelevant."[18]

92.     In November 2021, Samani was asked on Twitter, "What % of SOL do you [and] Multicoin own?"[19] He responded that "[the Multicoin Defendants] own 10-figures worth across our various funds."[20]

93.     Throughout 2021 and early 2022, the Multicoin Defendants have sold billions of dollars of SOL securities on retail investors such as Plaintiff.

94.     To offload the SOL securities, the Multicoin Defendants used OTC trading desks, such as U.S.-based FalconX, to act as a broker for the sale of SOL securities.

---

[16] Zack Seward, *Multicoin Leads $20 Million Round for Speed-Focused Solana Blockchain*, COINDESK (July 30, 2019), https://www.coindesk.com/markets/2019/07/30/multicoin-leads-20-million-round-for-speed-focused-solana-blockchain/.

[17] Mario Gabriele, *Multicoin Capital: The Outsiders*, GENERALIST (Mar. 20, 2022), https://www.readthegeneralist.com/briefing/multicoin-capital-1.

[18] Kyle Samani (@KyleSamani), TWITTER (Nov. 21, 2021, 11:02 AM), https://twitter.com/kylesamani/status/1462496730528813056?s=21.

[19] Evanss6 (@Evanss6), TWITTER, (Nov. 21, 2021, 7:36 PM), https://twitter.com/Evan_ss6/status/1462626034180833286.

[20] Kyle Samani (@KyleSamani), TWITTER, (Nov. 22, 2022, Nov. 22, 2021) https://twitter.com/KyleSamani/status/1462760330413715458.

95. Brokers, such as FalconX, sold the SOL securities by receiving them from the Multicoin Defendants and then selling the tokens through U.S.-based exchanges, such as Coinbase.

b. The Multicoin Defendants Solicited the Sale of SOL Securities

96. Samani, through his personal Twitter account, aggressively promoted and solicited others to purchase SOL securities. He first referenced Solana on Twitter on January 28, 2019, when he suggested "Solana" as an alternative to Ethereum.

97. The following timeline of statements, though non-exhaustive, are representative of the Multicoin Defendants' solicitations of SOL through Samini's Twitter account:

| DATE | TWEET / STATEMENT |
|---|---|
| July 30, 2019 | Samani tweets to promote Multicoin's "investment thesis in @solana!", linking an article on Multicoin's website that he authored: *The World Computer Should Be Logically Centralized*. |
| July 27, 2020: | Samani publishes a thread about Solana's history and development. |
| August 30, 2020: | "We are obviously long SRM and SOL." |
| September 24, 2020: | "SOL is listed on http://binance.us and http://ftx.us today!" |
| October 3, 2020 | "Yes big SOL holder," in response to "Are you a @solana fan directionally?" |
| October 21, 2020 | Samani claims Solana is the "Fastest chain" and announces the availability of stablecoin USDC on Solana: "Big day for Solana USDC!!!!! Live *today*." |
| November 3, 2020: | Samani promotes the "first virtual Multicoin Summit, with presentations including @solana . . . ." |
| January 7, 2021: | Samani states: "the holder base of SOL is basically all strong hands," explaining "we [Multicoin] are long SOL obviously We actually bought more recently! We are not selling." |

| | |
|---|---|
| January 18, 2021: | in response to a comment questioning the Solana network's ability to handle a new application based on past performance, Samani asserts:<br><br>"Solana core (consensus + VM + networking) was fine<br><br>Just all the things on the edges broke... RPC calls, wallets, etc<br><br>To be expected". |
| February 7, 2021: | Samani tweets: "The key things that make Solana fast are here" with a link to Yakovenko's article, *8 Innovations that Make Solana the First Web-Scale Blockchain* (July 29, 2019). |
| February 18, 2021: | Samani announces he is "taking [his] SOL to the grave". |
| February 23, 2021 | Samani asserts that "we [Multicoin] own a giant bag of SOL<br><br>actions speak louder than words :)" |
| February 24, 2021 | "I run one of the largest crypto funds<br><br>Can we talk about @solana<br><br>We are the seed and largest investors" |
| March 29, 2021: | Samani argues: "The 'VCs hold all of the coins' argument is pretty weak<br><br>1) In Solana and Polkadot, all of the weak hands have already sold<br><br>2) Even large holders like Multicoin will be a forced seller one day (our funds have a fixed life and we have to return capital)." |
| May 3, 2021 | Samani writes that "Solana is usable now" in response to assertion that "Solana [is] centralized, overhyped, no development, not usable for 4 years" |
| May 26, 2021 | Samani tweets "The perennial @solana thesis," linking to his article, *Technical Scalability Creates Social Scalability*, which contends that Solana is "the only blockchain protocol" that could help Coinbase "onboard 50M users to DeFi." |

| | |
|---|---|
| May 27, 2021 | Samani responds "I think you mean when SOL crosses $5,000." |
| June 14, 2021 | Samani writes that "big cos will all build on solana. It provides predictability and stability." |
| June 23, 2021 | Samani claims "solana rivals NYSE throughput today." |
| August 20, 2021 | Samani appears on Unchained Podcast (Aug. 20, 2021, publication); "Show highlights" include "why Solana decreases the risk of massive liquidations," "why Solana could be the basis for the next crypto bull run," and "why Kyle is not overly concerned about Solana being more centralized than Ethereum." |
| August 27, 2021 | Samani suggests that the value of a SOL token is $5,000. |
| August 30, 2021 | Samani (again) announces he will be "[t]aking SOL to the grave." |
| September 1, 2021: | Samani defends Solana and Yakovenko in response to tweets critical of Solana's centralization, writing "by virtually every metric, solana is becoming more decentralized over time," and that Samani does not "think Anatoly knows 1000+ node operators personally." |
| September 5, 2021 | Samani advises: "Never sell SOL." |
| September 9, 2021 | Samani reminds that "SOL traded near private sale price for months from April -august of last year." |
| September 10, 2021 | Samani writes: "The beautiful thing about solana is that it runs at the speed of hardware. It's hard to see plausible ways to go faster." |
| September 15, 2021 | Samani boasts: "Anyone who bought SOL in 2020 and held can afford to rent a Ferrari today." |
| October 28, 2021: | Samani promotes Solana's new availability on the Crypto.com exchange: a "Fiat bridge directly onto solana!" |
| November 2, 2021 | Samani posts "The world is healing" above an image of the price of SOL (up 6.1% to $212.22). |
| November 11, 2021: | Samani "will happily . . . argue that SOL will pass BTC in market cap." (For perspective, on this day, BTC's market |

| | |
|---|---|
| | cap was approximately $1.21 trillion; SOL's about $69.22 billion.) |
| November 22, 2021 | Samani explains: "We [Multicoin] own 10-figures worth across our various funds," having "accumulated our position across many transactions, SAFT primaries, Buying out other SAFT holders (this is tricky to do, but can be done since most SOL SAFT holders were publicly announced), Buying on open market, Across at least 3 vehicles over a multi year span";<br><br>"we [Multicoin] have sold probably 1-2% of our SOL that has not been distributed in kind." |
| December 1, 2021: | Samani announces "there is a mega bid for SOL rn" from "[e]very billionaire in the world calling SBF [Sam Bankman-Fried] and I." |
| December 12, 2021 | Samani "expect[s] SOL and ETH to substantially outperform BTC through the next 'bear market'<br><br>The tech money doesn't care about macro<br><br>They just want to be long the stuff that they think is going to change the world"; and "[a]s people recognize that this is becoming true, a lot of the money in BTC will rotate out and into SOL and ETH and other more productive names". |
| January 19, 2022 | Samani retweets Solana's promotion of the "Solana Hacker House World Tour," adding "Multicoin is aiming to have a presence at every Solana hacker house. If you're building at a hacker house, reach out! My DMs are open" |
| April 24, 2022 | Samani writes: "You build products for real people… by understanding how they use it, and then optimizing accordingly [¶] Solana's North Star has always been decentralized NASDAQ". |

**E. SOL Is a Security**

98. On April 3, 2019, the SEC published a "Framework for 'Investment Contract' Analysis of Digital Assets." The SEC Framework provides guidance for analyzing whether a digital asset has the characteristics of one particular type of security – an "investment contract." As explained in the SEC Framework:

> The U.S. Supreme Court's *Howey* case and subsequent case law have found that an 'investment contract' exists when there is the investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others. The so-called "*Howey* test" applies to any contract, scheme, or transaction, regardless of whether it has any of the characteristics of typical securities. The focus of the *Howey* analysis is not only on the form and terms of the instrument itself (in this case, the digital asset) but also on the circumstances surrounding the digital asset and the manner in which it is offered, sold, or resold (which includes secondary market sales). Therefore, issuers and other persons and entities engaged in the marketing, offer, sale, resale, or distribution of any digital asset will need to analyze the relevant transactions to determine if the federal securities laws apply.[21]

99. The SEC has repeatedly taken the position that SOL securities are indeed securities. On June 5, 2023, the SEC averred in its case against Binance that "[b]etween May 2018 and early March 2020, Solana Labs filed with the SEC multiple forms claiming that its offers and sales of securities[,]" namely, "rights to receive Solana Labs, Inc. tokens in the future[,] " were exempt from registration.[22] The SEC took that same position, verbatim, in its suit against Coinbase on shared grounds, filed the next day.[23] As recently as November 20, 2023, the SEC has maintained that SOL tokens are securities, using that same quoted language in its enforcement action against the Kraken crypto exchange.[24]

100. The SEC Framework makes clear that "[w]hether a particular asset at the time of its offer or sale satisfies the *Howey* test depends on the specific facts and circumstances." The specific facts and circumstances relating to SOL securities support the conclusion that SOL is a security under the *Howey* test.

101. Purchasers who bought SOL securities have invested money or given valuable services to a common enterprise, Solana. These purchasers have a reasonable expectation of profit based upon the efforts of the promoters, Solana Labs and the Solana Foundation, to build a blockchain network

---

[21] SEC Framework § I, https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets (internal citations omitted).

[22] Complaint at ¶ 366, *SEC v. Binance Holdings Limited*, No. 1:23-cv-01599, Dkt. 1 (D.D.C. June 5, 2023) (emphasis added).

[23] Complaint at ¶ 129, *SEC v. Coinbase, Inc.*, No. 1:23-cv-04738, Dkt. 1, (S.D.N.Y. June 6, 2023) (verbatim).

[24] Complaint at ¶ 428, *SEC v. Payward, Inc.*, No. 3:23-cv-06003, Dkt. 1, (N.D. Cal. Nov. 20, 2023) (verbatim).

that will rival Bitcoin and Ethereum and become the accepted framework for transactions on the blockchain.

a. SOL Investors Invested Money

102. Investors in Solana made an investment of money or other valuable consideration for purposes of *Howey*. The SEC Framework states that "[t]he first prong of the *Howey* test is typically satisfied in an offer and sale of a digital asset because the digital asset is purchased or otherwise acquired in exchange for value, whether in the form of real (or fiat) currency, another digital asset, or other type of consideration."[25]

103. Plaintiff and the Class invested fiat and other digital currencies to purchase SOL securities. Indeed, as a result of Solana Labs and the Solana Foundation's efforts, SOL securities have been listed on many cryptoasset exchanges, which permit investors to purchase SOL with bitcoin, ether, and other digital assets.

104. Defendant Solana Labs sells SOL securities to the general public through cryptocurrency exchanges.

b. SOL Investors Participated in a Common Enterprise

105. The SEC Framework states that "[i]n evaluating digital assets, we have found that a 'common enterprise' typically exists."[26] The SEC Framework also elaborates: "Based on our experiences to date, investments in digital assets have constituted investments in a common enterprise because the fortunes of digital asset purchasers have been linked to each other or to the success of the promoter's efforts."[27]

106. SOL securities are no exception to the SEC Framework's observation regarding the "common enterprise" element of the *Howey* test. The prospective profits of Plaintiff and the Class, if any, are intertwined with the fortunes of Solana Labs and the Solana Foundation, who issue and promote SOL securities, and who are responsible for supporting and building SOL and the Solana

[25] SEC Framework § II(A), https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets

[26] *Id.* § II(B).

[27] *Id.* at n.11 (citing *SEC v. Int'l Loan Network, Inc.*, 968 F.2d 1304, 1307 (D.C. Cir. 1992)).

network, pooled investors' assets, and effectively controlled those assets. Moreover, Solana Labs and Solana Foundation have retained a significant stake in SOL securities, more than 50% together, thus sharing in the profits and risk of the venture.

107. In addition, the profits of each investor in SOL securities are inextricably intertwined with those of all other purchasers because SOL is fungible.

c. SOL Investors Purchased SOL Securities with a Reasonable Expectation of Profit

108. With respect to the element of "reasonable expectation of profits," the SEC Framework states that "[a] purchaser may expect to realize a return through participating in distributions or through other methods of realizing appreciation on the asset, such as selling at a gain in a secondary market."[28]

109. Investors in SOL securities, including Plaintiff and the Class, made their investment with a reasonable expectation of profits.

110. The SEC Framework lays out several characteristics informative of whether the "reasonable expectation of profits" element is met. The SEC Framework states that "[t]he more the following characteristics are present, the more likely it is that there is a reasonable expectation of profit."[29] Based on the facts above, each characteristic identified by the SEC Framework is present in the case of SOL securities:

- The SOL securities give the holder rights to share in the enterprise's income or profits or to realize gain from capital appreciation of the SOL securities. This is shown through the SOL "staking" feature, which allows SOL securities holders to select validators for additional gains.

- The opportunity of gain comes from appreciation in the value of SOL securities derived, in part, from the efficacy of the Solana network, including its operation and developments related to its performance, adoption, use, strength, and speed.

[28] *Id.* § II(C).

[29] *Id.* § II(C)(1).

- SOL securities are bought and sold on exchanges in the U.S., which are secondary trading markets where SOL holders can resell their SOL securities to other investors and realize gains.

- SOL securities are both tradable and transferable on these secondary markets.

- Purchasers reasonably would expect that Solana Labs and the Solana Foundation's efforts will result in capital appreciation of the SOL securities and therefore be able to earn a return on their purchase.

- The efforts Solana undertakes are "undeniably significant ones," *i.e.*, "those essential managerial efforts which affect the failure or success of the enterprise," as opposed to ministerial efforts.

- SOL securities are offered broadly to potential retail investors, rather than being targeted to expected users of any goods or services offered by Solana, or those who have a need for the functionality of the network.

- SOL securities are offered and purchased in quantities indicative of investment intent instead of quantities indicative of a user of the network.

- There is little apparent correlation between the purchase/offering price of SOL securities and the market price of the particular goods or services that can be acquired in exchange for SOL securities, because the SOL securities do not themselves entitle a holder to any goods and services.

- There is little apparent correlation between quantities the SOL securities typically trade in (or the amounts that purchasers typically purchase) and the amount of the underlying goods or services a typical consumer would purchase for use or consumption. That is because SOL securities do not have underlying goods and services that consumers or retail investors would use.

- Solana Labs and the Solana Foundation have raised an amount of funds in excess of what may be needed to establish a functional network or digital asset. Indeed, as noted above, they have raised hundreds of millions of dollars.

- Solana Labs and the Solana Foundation are able to benefit from their efforts as a result of holding the same class of SOL securities as those being distributed to the public. For example, as Solana Labs and the Solana Foundation's promotional efforts induced more investors to purchase SOL securities, the price of those securities increased, thereby benefiting Solana Labs and the Solana Foundation, who both hold significant amounts of SOL securities.

- Solana Labs and the Solana Foundation continue to expend funds from proceeds or operations to enhance the functionality or value of the network that gives SOL securities their perceived value. For example, Solana Labs' $314 million capital raise in June 2021 was reportedly conducted to enable Solana Labs and the Solana Foundation "to build an expansive decentralized finance (DeFi) ecosystem atop the Solana blockchain."

- SOL securities are marketed, directly or indirectly, using:
  - The expertise of Solana Labs, the Solana Foundation, and Yakovenko and/or their ability to build or grow the value of the network that gives SOL securities their perceived value.
  - SOL securities are marketed in terms that indicate it is an investment or that the solicited holders are investors.
  - The intended use of the proceeds from the sale of the SOL securities is to develop the network that gives SOL securities their perceived value. Consistent with that, as reported by industry publication Decrypt, following the announcement that Solana Labs had raised over $300 million to develop DeFi infrastructure, the price of SOL securities increased by over 20%.

- The future (and not present) functionality of the network— and the prospect that Solana will deliver that functionality—gives SOL securities their perceived value.
- The promise (implied or explicit) to build a business or operation as opposed to delivering currently available goods or services for use on an existing network likewise drives the value of SOL securities.
- The ready transferability of SOL securities is a key selling feature.
- Defendants have ensured the existence of a market for the trading of SOL securities, particularly where the Defendants implicitly or explicitly promise to create or otherwise support a trading market for SOL securities.

111. That investors have a reasonable expectation of profit is shown by the announrncement, in September 2023, that Visa would expand its use of Solana to process transactions.[30] When this news became public, prices of SOL "jumped" by 6%, at a time where prices of other cryptoassets was flat or declining.[31] The Visa news also saw a sharp rise in Total Value Locked (TVL) on the blockchain. More than $2 million was added in a matter of hours. "A rise in TVL means that user deposits are increasing - suggesting that there is more interest in the Solana blockchain. More interest, of course, means more users and more users means more buying pressure which could positively impact the price of SOL."[32]

[30] Mustafa Bedawala & Arjuna Wijeyekoon, *A Deep Dive on Solana, a High Performance Blockchain Network*, VISA, https://usa.visa.com/solutions/crypto/deep-dive-on-solana.html (last accessed Jan. 12, 2024).

[31] Tanaya Macheel, *Solana Jumps on Visa Stablecoin Announcement as Bitcoin and Other Cryptocurrencies Remain Flat*, CNBC (Sept. 5, 2023), https://www.cnbc.com/2023/09/05/solana-jumps-on-visa-stablecoin-announcement-as-bitcoin-and-other-cryptocurrencies-remain-flat.html.

[32] Anthony Cerullo, *Visa and Solana (SOL) News Shake up the Crypto Industry: Is it Real?*, YOUHODLER (Sept. 6, 2023), https://www.youhodler.com/blog/solana-visa.

112. As predicted,SOL securities experienced significant gains through the end of 2023. In fact, the Solana blockchain led the Q4 cryptocurrency "market rally".[33] For most of 2023, the Solana ecosystem's daily fee payers ranged between 80,000 and 100,000.[34] In December 2023, this number surged to 450,000. The Solana blockchain's Q4 growth extended across numerous metrics, "including market cap (423%), average daily fee payers (102%), DeFi TVL (303%), average daily DEX volume (961%), and average daily NFT volume (359%)." Furthermore, "Solana Foundation's annual Breakpoint conference helped drive growth, with many big announcements and launches from teams including Jupiter perps and token, Frankendancer, Backpack Exchange, and Render's migration." [35]

d. The Success of SOL Requires Efforts of Solana Labs and Others

113. The SEC Framework explains:

> When a promoter, sponsor, or other third party (or affiliated group of third parties) (each, an 'Active Participant' or 'AP') provides essential managerial efforts that affect the success of the enterprise, and investors reasonably expect to derive profit from those efforts, then this prong of the test is met. Relevant to this inquiry is the "economic reality" of the transaction and "what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect." The inquiry, therefore, is an objective one, focused on the transaction itself and the manner in which the digital asset is offered and sold.[36]

114. Specifically, with respect to the element of "reliance on the efforts of other," the SEC Framework states:

> The inquiry into whether a purchaser is relying on the efforts of others focuses on two key issues:
>
> - Does the purchaser reasonably expect to rely on the efforts of a [promoter]?

---

[33] Messari (@MessariCrypto), TWITTER (Jan. 11, 2024, 8:06 AM), https://x.com/MessariCrypto/status/1745477216916386178?s=20.

[34] Peter Horton, *State of Solana Q4 2023*, MESSARI (Jan. 11, 2024), https://messari.io/report/state-of-solana-q4-2023.

[35] *Id.*

[36] SEC Framework § II(C), https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets.

- Are those efforts "the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." As opposed to efforts that are more ministerial in nature?[37]

115.     The SEC Framework further explains that the more of the following characteristics (among others) that are present, "the more likely it is that a purchaser of a digital asset is relying on the 'efforts of others'":

- An ["Active Participant" or "AP"] is responsible for the development, improvement (or enhancement), operation, or promotion of the network.

- The AP is expected to perform essential tasks.

- The AP controls the market for the digital asset, such as by limiting the supply.

- The AP has a lead role in the development of the network or role of the digital asset.

- The AP decides who receives digital assets and under what conditions.

- The AP distributes the digital assets to internal team members as compensation.

116.     Shifting its focus to the numerous facts bearing on the nature of the digital asset at issue, the SEC explained still further that the greater the presence of the following factors (among other), the less likely the *Howey* test is met:

- The distributed ledger network and digital asset are fully developed and operational.

- Holders of the digital asset are immediately able to use it for its intended functionality on the network, particularly where there are built-in incentives to encourage such use.

- The digital assets' creation and structure is designed and implemented to meet the needs of its users, rather than to feed speculation as to its value or development of its network. For example, the digital asset can only be used on the network and generally can be held or transferred only in amounts that correspond to a purchaser's expected use.

- Prospects for appreciation in the value of the digital asset are limited.

---

[37] *Id.* § II(C)(1).

- With respect to a digital asset referred to as a virtual currency, it can immediately be used to make payments in a wide variety of contexts, or acts as a substitute for real (or fiat) currency.
- With respect to a digital asset that represents rights to a good or service, it currently can be redeemed within a developed network or platform to acquire or otherwise use those goods.
- If the AP facilitates the creation of a secondary market, transfers of the digital asset may only be made by and among users of the platform.

117. The cornerstone of the value of SOL securities is the sum of Solana Labs, Solana Foundation, and Yakovenko's management and implementation of the Solana blockchain. They created the Solana blockchain network and all of the SOL securities in circulation, and likewise determined who would receive SOL securities and under what conditions (including by granting employees and team members SOL securities compensation) and the extent to which additional SOL securities would be introduced into the market.

118. Plaintiff and the Class have entirely passive roles vis-à-vis the success of the Solana blockchain network and SOL. Rather, as Solana Labs and the Solana Foundation's own marketing makes clear, the success of the Solana network and the profits the Class reasonably expected to derive from investing in the SOL securities, are dependent on the essential technical, entrepreneurial, and managerial efforts of Solana Labs, the Solana Foundation, and Yakovenko, and their agents and employees.

119. Plaintiff's and other class members' reliance on Defendants' expertise is reflected in the reaction of SOL securities' trading prices based on developments in the efficacy of the Solana network.

**F. Plaintiff and the Other Class Members Have Suffered Significant Damages from Defendants' Actions**

120. As a direct result of Defendants' misconduct, Plaintiff and the other Class Members—many of whom are retail investors who lack the technical and financial sophistication necessary to have evaluated the risks associated with their investments in SOL securities—have suffered significant damages, in an amount to be proven at trial. The SOL securities today are worth far less than the price

the Class Members paid for them. Inasmuch as Plaintiff and the other Class members still hold SOL securities, they demand rescission and make any necessary tender of the SOL securities.

## V. CLASS ALLEGATIONS

121.    Plaintiff brings this action on behalf of himself and, under Rules 23(a), (b), and (c)(4) of the Federal Rules of Civil Procedure, on behalf of the following class (the "Class") of persons:

> All persons or entities who purchased SOL securities from March 24, 2020, to the present. Excluded from the Class are corporate officers, members of the boards of directors, and senior executives of Defendants; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which Defendants have or had a controlling interest.

122.    Plaintiff reserves the right to amend the definition of the Class if further investigation and/or discovery indicate that the Class definition should be narrowed, expanded, or otherwise modified.

123.    The members of the Class are so numerous that joinder of all members is impracticable. Millions of SOL securities have been sold. The precise number of members of the Class is unknown to Plaintiff at this time, but it is believed to be in the tens of thousands.

124.    The members of the Class are readily ascertainable and identifiable. They may be identified by reference to Defendants' own databases, blockchain ledger information, and/or cryptocurrency exchange databases. They may be notified of the pendency of this action by electronic mail using a form of notice customarily used in class actions.

125.    Plaintiff will fairly and adequately protect the interests of the Class because Plaintiff's claims are typical and representative of the claims of all members of the Class. Plaintiff has no interests antagonistic to, or in conflict with, those of the Class.

126.    Plaintiff's claims are typical of the claims of all Class members, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of state and federal securities laws.

127.    There are no unique defenses that may be asserted against Plaintiff individually, as distinguished from the other members of the Class, and the relief sought is common to the Class.

Plaintiff is typical of other members of the class, does not have any interest that is in conflict with or is antagonistic to the interests of the members of the Class, and has no conflict with any other members of the Class.

128.    Plaintiff has retained competent counsel experienced in securities, consumer protection, and class action litigation to represent himself and the Class.

129.    Questions of law and fact common to the Class that predominate over any questions that may affect only individual members of the Class include, but are not limited to:

- Whether SOL securities are securities under the Securities Act;

- Whether Defendant Solana Labs' offerings and sales of SOL securities violate the registration provisions of the Securities Act;

- Whether SOL securities are securities under the California Corporations Code;

- Whether Defendant Solana Labs' offerings and sales of SOL securities violate the registration provisions of the California Corporations Code;

- Whether Defendants' advertisements and statement regarding SOL securities were false and misleading; and

- The type and measure of damages suffered by Plaintiff and the Class.

130.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision with respect to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable. Finally, as the damages suffered by some of the individual members of the Class may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.

## VI. CAUSES OF ACTION

**<u>FIRST CAUSE OF ACTION</u>**
**Violation of Sections 5 and 12(a)(1) of the Securities Act**
**(Against Defendants)**

131. Plaintiff incorporates the allegations above.

132. Plaintiff brings this claim for violations of Sections 5 and 12(a)(1) of the Securities Act, 15 U.S.C. §§ 77e, 77l(a)(1).

133. Section 5(a) states: "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale." *Id.* § 77e(a).

134. Section 5(c) makes in unlawful "for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title." *Id.* § 77e(c).

135. When sold and issued, the SOL tokens were securities within the meaning of Section 2(a)(1) of the Securities Act, *id.* § 77b(a)(1), and Solana Labs is an issuer of the SOL that Plaintiff and the other Class members have purchased, *id.* § 77b(a)(4).

136. From approximately March 24, 2020, through the present, Defendants unlawfully made use of means or instruments of transportation or communication in interstate commerce or the mails for the purposes of offering, selling, or delivering of unregistered securities in direct violation of Sections 5(a) and 5(c) of the Securities Act.

137. The sale of SOL securities constituted the sale of unregistered securities under controlling federal law. SOL securities exhibit the following particular hallmarks of a security under

the *Howey* test: (a) in order to receive any SOL securities, an investment of money was required; (b) the investment of money was made into the common enterprise that is Solana; and (c) the success of the investment and any potential returns on such were entirely reliant on Solana and Yakovenko's ability to create the promised network.

138. Solana Labs, the Solana Foundation, and Yakovenko created and maintained SOL and profited handsomely from the sale of their SOL tokens.

139. Similarly, Defendants personally profited by soliciting investors to purchase SOL securities on multiple online platforms, and by selling SOL securities to such investors.

140. Accordingly, Defendants have violated Sections 5(a) and 5(c) of the Securities Act, *id.* §§ 77e(a), 77e(c), and are liable under Section 12(a)(1), *id.* § 77l(a)(1).

141. Plaintiff and the other Class members seek rescissionary damages with respect to their purchases of SOL tokens.

**SECOND CAUSE OF ACTION**
**Violation of Section 15 of the Securities Act**
**(Against the Control Person Defendants)**

142. Plaintiff incorporates the allegations above.

143. This Claim is asserted against Anatoly Yakovenko and Kyle Samani (together, the "Control Person Defendants") under Section 15 of the Securities Act, 15 U.S.C. §77o.

144. The Control Person Defendants, by virtue of their offices, stock ownership, agency, agreements or understandings, and specific acts were, at the time of the wrongs alleged herein, and as set forth herein, controlling persons within the meaning of Section 15 of the Securities Act. The Control Person Defendants, and each of them, had the power and influence and exercised the same to cause the unlawful offer and sale of SOL securities as described herein.

145. The Control Person Defendants, separately or together, possess, directly or indirectly, the power to direct or cause the direction of the management and policies of Solana, through ownership of voting securities, by contract, subscription agreement, or otherwise.

146. All Control Person Defendants have the power to direct or cause the direction of the management and policies of Solana Labs.

147. The Control Person Defendants, separately or together, have sufficient influence to have caused Solana Labs to submit a registration statement.

148. The Control Person Defendants, separately or together, jointly participated in, and/or aided and abetted, Solana Labs' failure to register SOL securities.

149. By virtue of the conduct alleged herein, the Control Person Defendants are liable for the wrongful conduct complained of herein and are liable to Plaintiffs and the Class for recission and/or damages suffered.

**THIRD CAUSE OF ACTION**
**Unregistered Offer and Sale of Securities in Violation of California Corporations Code Section 25110 and 25503**
**(Against Defendants)**

150. Plaintiff incorporates the allegations above.

151. SOL are securities within the meaning of the California Corporations Code.

152. Defendants, and each of them, by engaging in the conduct described above within California, directly or indirectly, sold and offered to sell securities.

153. Plaintiffs and members of the Class purchased SOL securities from Defendants.

154. No registration statements have been filed with any state or federal government entity or have been in effect with respect to any of the offerings alleged herein.

155. By reason of the foregoing, each of the Defendants have violated Sections 25110 and 25503 of the California Corporations Code.

156. As a direct and proximate result of Defendants' unregistered sale of securities, Plaintiffs and members of the Class have suffered damages in connection with their respective purchases of SOL securities.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand all judgment on his behalf and that of the Class as follows:

- Declaring that this action may be maintained as a Class action under rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, certifying Plaintiff as representative of the Class, and designating his counsel Schneider Wallace Cottrell Konecky LLP as Lead Counsel for the Class:

- Declaring that SOL is a security and that Defendants' unregistered sales of SOL securities violated applicable laws;
- Awarding damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including prejudgment interest thereon;
- Awarding such injunctive or other equitable relief as the Court may deem just and proper; and
- Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees.

## VIII. PLAINTIFF'S DEMAND FOR JURY TRIAL

Plaintiff asserts his rights under the Seventh Amendment to the United States Constitution and demand, in accordance with Federal Rule of Civil Procedure, Rule 38, a trial by jury on all issues triable by a jury.

Dated: January 12, 2024

Respectfully submitted,

*/s/ Matthew S. Weiler*

Todd M. Schneider (SBN 158253)
Matthew S. Weiler (SBN 236052)
Sunny S. Sarkis (SBN 258073)
**SCHNEIDER WALLACE**
**COTTRELL KONECKY LLP**
2000 Powell Street, Suite 1400
Emeryville, California 94608
Telephone: (415) 421-7100
Email: tschneider@schneiderwallace.com
Email: mweiler@schneiderwallace.com
Email: ssarkis@schneiderwallace.com

Jason H. Kim (SBN 220279)
**SCHNEIDER WALLACE**
**COTTRELL KONECKY LLP**
300 S. Grand Avenue, Suite 2700
Los Angeles, California 90071
Telephone: (415) 421-7100
Email: jkim@schneiderwallace.com

*Attorneys for Plaintiffs*