Brian E. Klein (Bar No. 258486)
bklein@waymakerlaw.com
Scott M. Malzahn (Bar No. 229204)
smalzahn@waymakerlaw.com
Kevin M. Casey (Bar No. 338924)
kcasey@waymakerlaw.com
WAYMAKER LLP
515 S. Flower Street, Suite 3500
Los Angeles, California 90071
Telephone: (424) 652-7800
Facsimile: (424) 652-7850

*Attorneys for Defendants Multicoin Capital Management LLC and Kyle Samani*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

MARK YOUNG, on behalf of himself and all others similarly situated,

Plaintiff,

v.

SOLANA LABS, INC.; MULTICOIN CAPITAL MANAGEMENT LLC; and KYLE SAMANI,

Defendants.

Case No. 3:22-cv-03912-RFL

**DEFENDANTS MULTICOIN CAPITAL MANAGEMENT LLC AND KYLE SAMANI'S REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**

Date: August 6, 2024
Time: 10:00 a.m.
Court: Courtroom 15 – 18th Floor
Judge: Hon. Rita F. Lin

WAYMAKER

**TABLE OF CONTENTS**


I. INTRODUCTION ........ 1

II. ARGUMENT ........ 1

A. First Cause of Action: Plaintiff Cannot Satisfy the Legal Test for Solicitation Against the Multicoin Defendants ........ 1

1. Plaintiff Admits that the Multicoin Defendants Did Not Receive Any Direct Financial Gain From His Alleged Purchases ........ 2

2. Plaintiff Admits There Is No Causal Connection Between His Alleged Purchases and Samani's Alleged Tweets ........ 3

3. The Content of Samani's Alleged Tweets Do Not Constitute Solicitation ........ 5

B. Second Cause of Action: Plaintiff Does Not and Cannot Allege that Samani Is Liable Under Section 15 ........ 8

1. Plaintiff Misstates the Standard for Section 15 Liability ........ 8

2. The Amended Complaint Fails to Allege Samani Controlled Labs ........ 9

III. CONCLUSION ........ 10

## I. INTRODUCTION

Plaintiff's[1] opposition to the Multicoin Defendants' motion to dismiss (the "Opposition") highlights his extraordinary and flawed theory of solicitation liability for his first cause of action under Section 12(a)(1). This claim fails for three reasons. *First*, the Multicoin Defendants' purported holdings of SOL are insufficient to allege a financial interest in Plaintiff's particular purchases such that it would be fair to align the Multicoin Defendants with Plaintiff's seller. *Second*, Plaintiff's concession that he did not even see the alleged solicitation statements attributed to the Multicoin Defendants is fatal to his Section 12 claim, as any alleged solicitation must "succeed" to be actionable. *Third*, the alleged statements identified in the AC do not constitute solicitation.

Plaintiff's second cause of action fares no better, as the Opposition misstates the standard for control-person liability under Section 15 and points to allegations in the AC that are irrelevant to the inquiry. Plaintiff's attempt to assert control-person liability over Samani, a managing partner of Multicoin (a reputable asset management firm that allegedly invested in SOL tokens), is a transparent bid to find a deep pocket. The only co-founder of *Labs* named in the AC, Anatoly Yakovenko, was recently dismissed after Plaintiff failed to effectuate service. (Dkt. 91.) Moreover, this Court should dismiss Plaintiff's two federal claims on the additional grounds set forth in Labs' motion to dismiss briefing, which in pertinent part are incorporated by reference.

Finally, Plaintiff's third cause of action must be dismissed, as he concedes he has no claims under Sections 25110 and 25503 of the California Corporations Code. The AC against the Multicoin Defendants should be dismissed with prejudice and without leave to amend.

## II. ARGUMENT

### A. First Cause of Action: Plaintiff Cannot Satisfy the Legal Test for Solicitation Against the Multicoin Defendants

For multiple independent reasons, the AC fails to plead facts sufficient to assert solicitation liability against the Multicoin Defendants.

[1] Capitalized terms not defined herein have the same meanings ascribed to them in the Multicoin Defendants' Motion to Dismiss. (Dkt. 80.)



WAYMAKER




**1. Plaintiff Admits that the Multicoin Defendants Did Not Receive Any Direct Financial Gain From His Alleged Purchases**

Plaintiff's first cause of action fails because the AC does not—and cannot—allege that the Multicoin Defendants were "motivated at least in part by a desire to serve [their] own financial interests or those of the securities owner" such that "it is fair to say the buyer 'purchased' the security from [them] and to align [them] with the owners in a rescission action" under Section 12(a)(1). *Pinter v. Dahl*, 486 U.S. 622, 646-47 (1988). Plaintiff argues this financial interest requirement is met because the Multicoin Defendants allegedly own "a significant amount" of SOL tokens and thus stand to benefit from increases in the market price of those tokens. (*See* Opp. at 17-18.) That theory, however, is inconsistent with *Pinter*, which distinguished between a person who gives "gratuitous advice, even strongly or enthusiastically," and a person who solicits a sale by "requesting value in exchange for his suggestion or seeking the value the titleholder will obtain in exchange for the ultimate sale" such that it would be fair to "align him with the owner in a rescission action." 486 U.S. at 647. The Supreme Court noted that, "[t]ypically," such persons "will have sought or received a personal financial benefit from the sale, such as where he anticipat[es] a share of the profits . . . or receives a brokerage commission[.]" *Id*. at 654 (citations omitted). No such financial benefit to the Multicoin Defendants is alleged in the AC.

In *Pino v. Cardone Cap., LLC*, the Ninth Circuit found there was "no question that Cardone and Cardone Capital had financial interests" because "Cardone Capital received 35% of the Funds' profits" and "Cardone personally controlled Cardone Capital." 55 F.4th 1253, 1258 (9th Cir. 2022). Indeed, the "offering statements describe[d] compensation tethered to contributed capital and distributions received" by the defendants—in other words, the defendants would actually receive a portion of each sales transaction. *Id.* at 1260. In *Wildes v. BitConnect Int'l PLC*, cited approvingly by *Pino*, the Eleventh Circuit found the financial gain requirement met where the defendant-promotor "convinced the plaintiffs to buy BitConnect through their referral programs and earned a commission on those investments." 25 F. 4th 1341, 1347 (11th Cir. 2022).

In contrast, the AC does not allege that the Multicoin Defendants had a financial interest in Plaintiff's purchases such that it would be "fair to say that the buyer 'purchased' the security *from*

[the defendant] and to align [the defendant] *with the owner* in a rescission action." *Pinter*, 486 U.S. at 647 (emphasis added). Indeed, in *Risley v. Universal Navigation Inc.*, 2023 WL 5609200 (S.D.N.Y. Aug. 29, 2023), which Plaintiff attempts to distinguish by emphasizing language addressing a separate, equally fatal defect elsewhere in the decision (Opp. at 10-11), the district court squarely addressed "the financial interest component" and found that an increase in the price of the UNI token—which the defendant possessed and which the plaintiff alleged would increase in price in tandem with increased trading activity—"cannot support a claim that [d]efendants had a financial interest in the particular transactions at issue." *Id.* at *8, *19. The number of tokens Multicoin allegedly owned thus has no bearing on Multicoin's purported solicitation, and Plaintiff cites no case law suggesting that such an allegation is sufficient to support his claim. Because the AC does not—and cannot—allege a financial interest in Plaintiff's purchases from an unnamed seller on the secondary market, Plaintiff's Section 12 claim against the Multicoin Defendants fails.

**2. Plaintiff Admits There Is No Causal Connection Between His Alleged Purchases and Samani's Alleged Tweets**

Equally fatal to Plaintiff's Section 12 claim is his admission that he was neither influenced by nor even aware of the purported statements attributed to the Multicoin Defendants, many of which postdate his purchases. (*See* Opp. at 11; AC ¶ 97.) Rather than explain how the Multicoin Defendants could have nevertheless successfully solicited purchases from him, Plaintiff denies that any such legal requirement exists. (*See* Opp. at 11 (arguing solicitation "should be construed broadly under *Pinter*, and does not require privity, reliance or causation").)

Plaintiff's argument that there is no reliance or causation element for a solicitation claim misreads *Pinter*, which rejected the substantial factor test in favor of a narrower interpretation of solicitation liability. 486 U.S. at 650. It observed that the substantial factor test was "grounded in tort doctrine" and that "no congressional intent to incorporate tort law doctrines of reliance and causation into § 12(1) emerges from the language or the legislative history of the statute[.]" *Id.* at 648-49. But even assuming Section 12 does not incorporate common law principles of proximate causation, the Court's observation does not support Plaintiff's theory that he need not allege *any* relationship whatsoever to the defendant's alleged acts of solicitation. To the contrary, solicitation



WAYMAKER

liability "extends only to the person who successfully solicits the purchase." *Id.* at 647. This test focuses on the existence of a relationship between the plaintiff-purchaser and the defendant-solicitor. *Id.* at 651. In *Pino*, for example, the plaintiff alleged he purchased the unregistered securities "days after attending a marketing presentation hosted by" one of the defendants. 55 F.4th at 1256. In *Wildes*, "the plaintiffs alleged that they had bought BitConnect coins 'because of' the promoters' 'recruitment efforts.'" 25 F.4th at 1347 (rejecting the argument the complaint failed to allege a purchase as a result of the solicitation). In contrast to *Pino* and *Wildes*, the AC does not allege any relationship or connection whatsoever between Plaintiff and Samani's purported tweets.

Moreover, Plaintiff relies on inapposite case law from the securities fraud context where reliance on a fraudulent statement is presumed under a fraud on the market theory.[2] *Pino*, for example, involved claims under Section 12(a)(2) for misstatements or omissions in real estate investment offering materials. 55 F.4th at 1255. *Pino* cites *Smolen v. Deloitte, Haskins & Sells*, 921 F.2d 959, 965 (9th Cir. 1990) for the proposition that "'[r]eliance is not an element of a section 12(2) claim.'" 55 F.4th at 1260 (ruling plaintiff "need not have alleged that he specifically relied on any of the alleged misstatements."). Yet even *Smolen* acknowledged that "although reliance [is] not required under Section 12(a)(2), some causal connection [is] required." *Smolen*, 921 F.2d at 965 (quoting *Barnes v. Resource Royalties, Inc.*, 795 F.2d 1359, 1366 n. 9 (8th Cir.1986), *cert. denied*, 493 U.S. 1077 (1990)).

In *Houghton v. Leshner*, another case Plaintiff relies on (Opp. at 11), the district court said in a footnote that allegations of plaintiff's "reliance on any of the statements or other solicitation-conduct . . . are not required for a Section 12 claim." 2023 WL 6826814, at *4 n.5 (N.D. Cal. Sept. 20, 2023). *Houghton* involved a Section 12(a)(1) claim, but it cited *Pino*'s language regarding reliance in the Section 12(a)(2) fraud context and an unreported S.D.N.Y. case, *In re Longfin Corp. Sec. Class Action Litig.*, which, in turn, relied upon a Second Circuit case involving a Section 12(a)(2) claim. *See* 2019 WL 1569792, at *5 (S.D.N.Y. Apr. 11, 2019) (citing *Rombach v. Chang*, 355 F.3d 164, 169 n.4 (2d Cir. 2004) ("Neither Section 11 nor Section 12(a)(2) requires

[2] *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 576 (1995).



WAYMAKER

that plaintiffs allege the scienter or reliance elements of a fraud cause of action.”)). To the extent *Houghton* ruled that there need be no causal connection or relationship between the alleged solicitation and plaintiff's purchase for a Section 12(a)(1) claim, it is inconsistent with *Pinter*'s holding that “liability extends only to the person who successfully solicits the purchase.” *See Pinter*, 486 U.S. at 647; *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (Article III standing requires “a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.”) (cleaned up).

The decision in *In Re Tezos Sec. Litig.*, 2018 WL 4293341 (N.D. Cal. August 7, 2018), is on point. Although Plaintiff tries to distinguish it on the ground that the investor-defendant did not publish any mass communications (Opp. at 11-10), the district court based its decision on the plaintiff's failure to “allege knowledge of [the investor's] name, let alone his venture capital activities” and concluded that “[w]ithout averments that he was cognizant of, or influenced by, [the investor's] involvement in the Tezos project,” the statutory seller claim against the investor was “not plausible.” *Id*. at *9. The same pleading deficiency exists here; as in *Tezos*, the Multicoin Defendants are mere collateral participants not alleged to have any role in Plaintiff's purchases.

**3. The Content of Samani's Alleged Tweets Do Not Constitute Solicitation**

Plaintiff relies heavily on *Pino* and cites it for the proposition that “solicitation by social media is actionable under Section 12.” (Opp. at 6.) But even assuming a defendant can solicit via public posts on social media, the content of the speech must still be “directed at producing [a] sale” or otherwise intended to “persuade potential investors to invest.” *See Pinter* 486 U.S. at 646; *Pino*, 55 F.4th at 1260. *Pino* does not support Plaintiff's argument. There, the founder of the issuer made multiple misstatements on social media that promised specific returns in order to encourage potential investors to purchase the offered security. *Id.* at 1256 (“I am offering investment opportunities to the everyday investor, like you! . . . [Y]ou're gonna walk away with a 15% annualized return.”).

None of Samani's alleged tweets are analogous to the statements at issue in *Pino* and cannot be fairly read as urging the reader to purchase SOL tokens. Plaintiff identifies eight



WAYMAKER

purported tweets in the Opposition among those alleged in the AC. (Opp. at 8; AC ¶ 97.) The September 24, 2020 tweet announces the listing of SOL on two secondary markets—construing this as solicitation would mean that anyone who posts a comment on social media about the availability of a token on an exchange would be considered a "seller" under Section 12. (Opp. at 8.) The November 3, 2020 tweet mentions the "first virtual Multicoin Summit, with presentations including @solana" and does not mention SOL at all. (*Id.*) The tweets dated January 7, 2021, February 17, 2021, August 5, 2021, and August 30, 2021 comment on Samani's intentions with regard to his own holdings of SOL, as well as that of Multicoin, and do not urge anyone to buy SOL. (*Id.*) The tweets from September 5, 2021 ("Never sell SOL") and September 15, 2021 ("Anyone who bought SOL in 2020 and held can afford to rent a Ferrari today") similarly reflect Samani's own experience with and views on SOL's performance to date; they do not promise future returns and do not urge anyone to purchase SOL. (*Id.*) The September 15 tweet also postdates Plaintiff's purchases, the latest of which occurred on September 9, 2021. (Dkt. 1 at 39-40.) The November 11, 2021 tweet likewise postdates Plaintiff's purchases and, in any event, only shows that Samani was willing to debate the value proposition of SOL against BTC, which is a far cry from promising future returns. (*Id.*) The remaining tweets identified in paragraph 97 of the AC, "all" of which Plaintiff argues constitute solicitation, are of a similar vein; not a single one urges or attempts to persuade the reader to purchase SOL. (*See id.*; AC ¶ 97.) It is not enough for Plaintiff to assert that the alleged tweets comment on the potential financial upside of investing in SOL; such commentary is no different from the underwriter-defendant who "forecasted a company's strong performance" (*Brody v. Homestore, Inc.*, 2003 WL 22127108, at *5 (C.D. Cal. Aug. 8, 2003)), or the celebrity-defendant who tweeted about a token on social media. *Davy v. Paragon Coin, Inc.*, 2021 WL 2940200, at *9 (N.D. Cal. Mar. 26, 2021). Even if the tweets urged purchases of SOL or gave its readers advice—and they did not—"'[s]oliciting' requires more than 'urg[ing] another to make a securities purchase . . . merely to assist the buyer' or 'the giving of gratuitous advice, even strongly or enthusiastically.'" *Id.* at *7 (quoting *Pinter*, 486 U.S. at 627).

Plaintiff's cited authorities are inapposite, since they do not address the pleading requirements for solicitation liability under Section 12(a)(1). (*See* Opp. at 7-8.) The issue in *LBRY*



WAYMAKER

was whether the defendant's offering constituted a "security" under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). *SEC v. LBRY*, 639 F. Supp. 3d 211, 216 (D.N.H. 2022). In that context, the district court found that certain statements conveyed to "potential investors that [LBRY] expected [the token] to grow in value through its managerial and entrepreneurial efforts" and were thus sufficient to meet the third prong of *Howey*. *Id.* at 219. The decision did not address solicitation whatsoever. *In re Kimberly Kardashian*, a negotiated SEC settlement that no court reviewed, involved a violation of Section 17(b) of the Securities Act for "touting the EMAX token sale on her social media account without disclosing that she received compensation from the issuer for doing so." SEC No. 3-21197, at 4 (Oct. 3, 2022). Plaintiff does not explain how *Kardashian*, which does not mention solicitation, supports his argument that the statements identified in the AC constitute solicitation under Section 12. Nor can he. Touting is not synonymous with solicitation under the securities laws; Section 17(b) prohibits communications that, "though not purporting to offer a security for sale," merely "*describes* such security for a consideration received or to be received . . . without fully disclosing the receipt . . . of such consideration and the amount thereof." 15 U.S.C. § 77q(b) (emphasis added); *cf. Pinter*, 486 U.S. at 643 (deriving solicitation liability from definition of "offer to sell"). Section 17(a) sheds no light on solicitation under Section 12.

Moreover, Plaintiff does not identify any statements made by *Multicoin*. Plaintiff argues "Samani and Multicoin are one and the same" for the purposes of Section 12 (Opp. at 9) instead of alleging "how each individual [defendant] played a direct role in the solicitation of the Plaintiff," as one must in order to properly state a Section 12 claim. *See Amarte USA Holdings, Inc. v. Kendo Holdings Inc.*, 2023 WL 8420896, at *7 (N.D. Cal. Dec. 4, 2023); *Mehedi v. View, Inc.*, 2023 WL 3592098, at *12 (N.D. Cal. May 22, 2023). Plaintiff attempts to distinguish *Mehedi* and *Amarte* by arguing "Plaintiff has already alleged that Samani has held himself out as synonymous with Multicoin," citing one paragraph in the AC in which Samani uses the word "we" to refer to Multicoin and another paragraph in which he is identified as the Managing Partner of Multicoin. (*See* Opp. at 9.) To the extent Plaintiff is arguing that Multicoin's corporate identity should be disregarded, this argument fails. *See, e.g.*, *Conde v. Sensa*, 259 F. Supp. 3d 1064, 1068 (S.D. Cal. 2017) ("Ordinarily, a corporation is regarded as a legal entity, separate and distinct from its



WAYMAKER

stockholders, officers and directors, with separate and distinct liabilities and obligations.”). Because Plaintiff has not and cannot show that the Multicoin Defendants successfully solicited purchases from him, the Section 12 claim fails.

### B. Second Cause of Action: Plaintiff Does Not and Cannot Allege that Samani Is Liable Under Section 15

Even assuming Plaintiff could establish a primary violation by Labs (which he has not done and is required to do), Plaintiff’s Section 15 claim against Samani for control-person liability fails as a matter of law. It is not enough to allege that Samani is a managing partner of Multicoin, an influential asset management firm that allegedly invested in SOL tokens or gave advice to Labs. Control-person liability requires more than that. The AC does not and cannot allege facts showing Samani had the power to direct or exercise control over Labs’ management and policies.

#### 1. Plaintiff Misstates the Standard for Section 15 Liability

Plaintiff cites to an out-of-circuit decision to argue that “day-to-day involvement in the operations of a primary violator is not necessary for control person liability.” (Opp. at 15 (quoting *Lane v. Page*, 649 F. Supp. 2d 1256, 1308 (D.N.M. 2009).) But in *Lane*, the district court was attempting to construe the definition of control person under 17 C.F.R. § 230.405 to “comport[] better with the Tenth Circuit case law” and, in any event, concluded that the relevant question is whether the defendant has “the potential to direct the particular transactions at issue, rather than actually exercising that power.” *Id.* Courts in the Ninth Circuit similarly look to the “possession, direct or indirect, of the power to direct or cause the direction of the management and policies,” rather than the exercise of such power in an isolated transaction—and in determining whether a defendant possesses such power, courts place “great weight on the overall situation” and look to “the defendant’s participation in the day-to-day affairs of the corporation and the defendant’s power to control corporate actions.” *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1162 (9th Cir. 1996). The day-to-day involvement of the defendant and his ability to direct management and policies thus get to the defendant’s *ability* to exercise power over the principal violator, and not “the defendant’s involvement in an isolated corporate action.” *Id.*

The mere fact that *Paracor* is a "28-year-old case" that addressed control-person liability under Section 20 of the Exchange Act (Opp. at 16) is inconsequential. *Paracor* remains good law, and a "control person" is given the same interpretation under both Section 20 of the Exchange Act and Section 15 of the Securities Act. *See Durham v. Kelly*, 810 F.2d 1500, 1503 (9th Cir. 1987) (both acts must be "given the same interpretation because section 20(a) of the Exchange Act is an analogue of section 15 of the Securities Act") (citations omitted); *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 746 (S.D.N.Y. 2015) ("Section 15 is a parallel provision to § 20(a) and their terms are interpreted in the same manner.") (citations omitted). Moreover, although the heightened pleading standard under Rule 9 applies to fraud claims, allegations regarding "'control' may be pleaded in accordance with Rule 8(a)'s notice-pleading standard." *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 660–61 (S.D.N.Y. 2007). There is thus no basis to distinguish *Paracor* on this ground. (*See* Opp. at 16.) Plaintiff argues that *In re Wells Fargo Mortg. Backed Certificates Litig.*, 712 F.Supp.2d 958, 969 (N.D. Cal. 2010)[3] and *In re Juniper Networks, Inc. Sec. Litig*., 542 F. Supp. 2d 1037 (N.D. Cal. 2008) are distinguishable because the primary violations in those cases did not involve Section 12. (Opp. at 18.) But control-person liability under Section 15 does not turn on the nature of the underlying violation—regardless of the alleged violation, a plaintiff must show that "the defendant had the power to influence or control the primary violator." *Juniper*, 542 F. Supp. 2d at 1053.

**2. The Amended Complaint Fails to Allege Samani Controlled Labs**

Plaintiff relies on three allegations to support its Section 15 claim against Samani: (1) an alleged statement in which a co-founder of Labs said that Multicoin "felt like a third co-founder"; (2) Samani's purported "financial backing and ownership stake"; and (3) his alleged "garish claims that Solana Securities would be bigger than bitcoin." (Opp. at 15.) None of these allegations are sufficient.

[3] Plaintiff argues that *Wells Fargo* "concerns credit rating agencies", but offers no explanation of why the nature of the control-person defendant's business has any bearing on whether that defendant exercised control over the primary violator.

*First*, Plaintiff's reliance on a Solana co-founder's alleged statement that Multicoin "felt like a third co-founder" is woefully inadequate. Plaintiff must allege the defendant had the "general 'power to direct or cause the direction of the management and policies'" of Labs. *Wells Fargo*, 712 F. Supp. 2d at 970 (quoting 17 C.F.R. § 230.405). Instead, Plaintiff appears to rely on an implicit theory of proximate causation, as he claims over and over that Multicoin was intimately involved in Solana's development and that Multicoin's efforts were "integral" in getting Labs through difficult times. (Opp. at 17-19.) But even assuming Multicoin's efforts were necessary to the survival of Labs, "proximate causation is not a sufficient basis for 'control person' liability, which requires the exercise of actual power or influence over a company." *Wells Fargo*, 712 F. Supp. 2d at 970 (quoting *In re Stratosphere Corp. Sec. Litig.*, 1 F.Supp.2d 1096, 1122 (D. Nev. 1998)); *see also Wright v. Schock*, 571 F. Supp. 642, 664 (N.D. Cal. 1983), *aff'd*, 742 F.2d 541 (9th Cir. 1984) ("Plaintiffs' theory—to call it 'novel' would be unduly complimentary—is that the banks and title companies collectively controlled GSHL because their services were indispensable. . . . Needless to say, plaintiffs provide the court with no authority to support this theory.").

*Second*, Plaintiff's claim that Samani's "financial backing and ownership stake" subject him to Section 15 liability fares no better, since these factors have no bearing on Samani's ability to control Labs—as Plaintiff concedes, the ownership of SOL does not confer any equity in Labs (Opp. at 3) and, in any event, Plaintiff concedes he "does not allege Samani is liable as a result of 'minority ownership' of a 'significant portion of shares' in order to substantiate" his control-person claims. (Opp. at 18.)

*Third*, there is simply no basis for Plaintiff's argument that Samani's allegedly "garish claims" regarding SOL are somehow relevant to the question of Samani's power to direct the management and policies of Labs. Plaintiff's Section 15 against Samani fails.

## III. CONCLUSION

For all these reasons, this Court should dismiss the claims against the Multicoin Defendants. Because Plaintiff has not demonstrated he can cure the deficiencies in the AC, dismissal should be with prejudice.

DATED: June 20, 2024

WAYMAKER LLP

By: */s/ Scott M. Malzahn*

BRIAN E. KLEIN
SCOTT M. MALZAHN
KEVIN M. CASEY
*Attorneys for Defendants Multicoin Capital Management LLC and Kyle Samani*

