UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK YOUNG,<br><br>        Plaintiff,<br><br>v.<br><br>SOLANA LABS, INC., et al.,<br><br>        Defendants. | Case No. 22-cv-03912-RFL<br><br>**ORDER DENYING MOTION TO COMPEL ARBITRATION AND DENYING MOTIONS TO DISMISS WITHOUT PREJUDICE**<br><br>Re: Dkt. No. 76, 78, 80 |

      Plaintiff Mark Young has brought a putative class action suit against Solana Labs, Inc., Solana's lead investor Multicoin Capital Management LLC, and Multicoin's managing director Kyle Samani (collectively, "Defendants"), alleging that they promoted and sold Solana cryptocurrency tokens ("SOL tokens"), allegedly unregistered securities, to retail investors in the United States in violation of federal and state securities laws.[1] Young bought the SOL tokens at issue on Exodus, a third-party platform for acquiring and storing digital currencies. Defendants moved to compel arbitration based on an arbitration agreement into which Young allegedly entered with Exodus.

      The motion to compel arbitration is **DENIED**. Defendants have not submitted adequate proof that Young agreed to the Exodus Terms of Service ("TOS") containing the arbitration provision. Defendants' request for discovery concerning Young's agreement to the Exodus TOS is also **DENIED**. Even if Young had agreed to the Exodus TOS, Defendants are not signatories

---

[1] Plaintiffs voluntarily dismissed without prejudice Solana Labs' founder Anatoly Yakovenko and a related entity, the Solana Foundation. (Dkt. Nos. 90 & 91.)

1

and lack any basis to invoke the TOS to compel Young to arbitrate his claims against them. Defendants have no apparent relationship with Exodus, and they do not argue they were intended to be third-party beneficiaries of Exodus's alleged agreement with Young. Defendants contend that the agreement delegates the question of whether Defendants may enforce the Exodus TOS's arbitration provision against Young to the arbitrator, but there is no clear and unmistakable evidence that Young agreed to arbitrate arbitrability with Defendants. To the contrary, the Exodus TOS refers repeatedly to the arbitration agreement (and thus, the agreement to arbitrate arbitrability) as concerning disputes "between you and Exodus." At best, the Exodus TOS includes conflicting language that does not clearly and unmistakably reflect an agreement to arbitrate arbitrability with nonsignatories, so the issue is left for the courts to decide. On that issue, the Court concludes that Young is not equitably estopped from refusing to arbitrate his claims against Defendants, which are neither dependent upon nor inextricably bound up with the obligations imposed by the Exodus TOS.

I.   BACKGROUND

Young alleges that Solana issued SOL tokens via an initial coin offering in March 2020. (Dkt. No. 68, Consolidated Amended Class Action Complaint ¶ 4.) Shortly after that, the SOL tokens began trading on U.S. exchanges such as Coinbase, FTX, and Binance. (*Id.* ¶¶ 5, 85–86.) Solana and Multicoin allegedly promoted these secondary sales by, among other things, encouraging those exchanges to list SOL tokens for sale, touting the speed and reliability of its decentralized network, and announcing deflationary steps involving the "burning" of SOL tokens to drive up their value. (*Id.* ¶¶ 84–89, 97.) Allegedly, these promotional efforts initially drove up the price of SOL tokens in the United States before the trading value fell dramatically when network congestion and outages undercut the tokens' worth. (*Id.* ¶¶ 10–14.) Insiders at Solana and Multicoin, who owned many of those tokens, allegedly profited significantly by offloading the tokens via the secondary market, where they were sold to retail investors like Young. (*Id.* ¶¶ 13–14.) Young alleges that Defendants' promotion of SOL tokens violated federal and state securities laws concerning the sale of unregistered securities to retail customers in the United

2

States.

In his declaration in support of his request to serve as lead plaintiff in the consolidated class action, Young attested that he purchased the SOL tokens that are the subject of his complaint in a series of transactions on the third-party platform Exodus between August 19, 2021, and September 9, 2021. (Dkt. No. 33-3 ("Young Aff.") ¶ 5.) The operative complaint neither mentions Exodus, nor alleges any wrongdoing by Exodus.

Defendants contend that Young agreed to arbitrate the claims in this lawsuit based on his consent to the Exodus TOS, which was manifested through his download of the Exodus platform software. To support this claim, Defendants submitted an attorney declaration with screenshots of archived copies of the Exodus website from August 2021, which were obtained through the Wayback Machine. (Dkt. No. 78-1 ("McGill Decl."), Ex. A.) The screenshots show two avenues for downloading Exodus's software: (a) through a download to a computer desktop or (b) through a mobile download via the Apple App Store or Google Play. (*Id.*) Immediately above the button for download to a desktop, the website text states: "By downloading Exodus you agree to the Terms of Service." (*Id.*) The text appears in gray, and according to the declarant, the text becomes white if the user hovers their mouse over it, indicating it is a hyperlink. (*Id.* ¶¶ 6–7, Ex. A.) The hyperlink connects to Exodus's July 1, 2021 Terms of Service. (*Id.* ¶¶ 8–10, Ex. B.) No similar text appears above the two buttons for mobile download through either the App Store or Google Play. (*Id.*, Ex. A.) Defendants did not submit any evidence that Young accessed Exodus by downloading the software to his desktop, as opposed to via a mobile download or some other method.

The Exodus TOS describes itself as an agreement between "you and Exodus" and repeatedly describes the arbitration agreement as requiring arbitration of "disputes between you and Exodus" or "disputes with Exodus." Specifically, the TOS states on the first page:

> PLEASE READ THIS TERMS OF USE AGREEMENT (THE **"TERMS"**) CAREFULLY AS THEY FORM A BINDING LEGAL AGREEMENT BETWEEN YOU AND EXODUS MOVEMENT, INC. ("**EXODUS**" OR "**WE**: AND ITS DERIVATIVES) . . . .

3

> SECTION 10 OF THE TERMS CONTAINS AN ARBITRATION AGREEMENT WHICH WILL, WITH LIMITED EXCEPTIONS, REQUIRE DISPUTES BETWEEN YOU AND EXODUS TO BE SUBMITTED TO BINDING AND FINAL ARBITRATION. UNLESS YOU OPT OUT OF THE ARBITRATION AGREEMENT: (1) YOU WILL ONLY BE PERMITTED TO PURSUE CLAIMS AND SEEK RELIEF AGAINST US ON AN INDIVIDUAL BASIS, NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION OR PROCEEDING; AND
> (2) YOU ARE WAIVING YOUR RIGHT TO SEEK RELIEF IN A COURT OF LAW AND TO HAVE A JURY TRIAL ON YOUR CLAIMS.

(McGill Decl., Ex. B at 2 (emphasis in original).)  Section 10 provides:

> **10. <u>Dispute Resolution</u>.** *Please read this Section 10 (the "Arbitration Agreement") carefully. It requires you to arbitrate disputes with Exodus and limits the manner in which you can seek relief.*
>
> 10.1. Applicability of Arbitration. You agree that any dispute or claim relating in any way to your access or use of the Site, Services, or Software, or to any aspect of your relationship with Exodus, will be resolved by binding arbitration, rather than in court [with limited exceptions not applicable here] . . . .
>
> **IF YOU AGREE TO ARBITRATION WITH EXODUS, YOU ARE AGREEING IN ADVANCE THAT YOU WILL NOT PARTICIPATE IN OR SEEK TO RECOVER MONETARY OR OTHER RELIEF IN ANY LAWSUIT FILED AGAINST EXODUS ALLEGING CLASS, COLLECTIVE, AND/OR REPRESENTATIVE CLAIMS ON YOUR BEHALF. INSTEAD, YOU MAY BRING YOUR CLAIMS AGAINST EXODUS IN AN INDIVIDUAL ARBITRATION PROCEEDING . . . .**
>
> 10.3. <u>Authority of Arbitrator</u>. The arbitrator, and not any federal, state or local court or agency will have exclusive authority to (a) determine the scope and enforceability of this Arbitration Agreement and (b) resolve any dispute related to the interpretation, applicability, enforceability or formation of this Arbitration Agreement including, but not limited to any claim that all or any part of this Arbitration Agreement is void or voidable. The arbitration will decide the rights and liabilities, if any, of you and Exodus.  The arbitration proceeding will not be consolidated with any other matters or joined with any other cases or parties . . . . The arbitrator has the same authority to award relief on an individual basis that a judge in a court of law would have. The award of the arbitrator is final and binding upon you and us.
>
> 10.4. <u>Waiver of Jury Trial</u>. YOU AND EXODUS HEREBY WAIVE ANY CONSTITUTIONAL AND STATUTORY RIGHTS

>>TO SUE IN COURT AND HAVE A TRIAL IN FRONT OF A JUDGE OR A JURY. You and Exodus are instead electing that all claims and disputes will be resolved by arbitration under this Arbitration Agreement, except as specified in Section 10.1 above….

(*Id.* at 7–8 (emphasis in original).)

Defendants moved to compel arbitration based on the arbitration agreement in the Exodus TOS. Defendants have not submitted any evidence that they are related to Exodus in any way or that Young otherwise entered into an arbitration agreement with Defendants.

## II. LEGAL STANDARD

In considering a motion to compel arbitration, the court applies a summary judgment standard and thus may consider evidence outside of the pleadings, such as declarations. *See Hansen v. LMB Mortgage Servs., Inc.*, 1 F.4th 667, 670 (9th Cir. 2021) (noting that application of the summary judgment standard is appropriate when evaluating a motion to compel arbitration); *R.A. v. Epic Games, Inc.*, No. CV 19-1488-GW-EX, 2019 WL 6792801, at *6 (C.D. Cal. July 30, 2019) ("The present case involves a motion to compel arbitration where extrinsic evidence, including declarations, is considered and both sides filed multiple declarations in support of their positions.").

The Federal Arbitration Act ("FAA") provides that an agreement to arbitrate disputes arising from "a contract evidencing a transaction involving commerce" shall be "valid, irrevocable, and enforceable." 9 U.S.C. § 2. "The court's role under the [FAA] is . . . limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). The party seeking to compel arbitration bears the burden as to both elements. *Ashbey v. Archstone Prop. Mgmt., Inc.*, 785 F.3d 1320, 1323 (9th Cir. 2015).

"[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983). However, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (quoting *United Steelworkers of Am. v. Warrior &*

*Gulf Nav. Co.*, 363 U.S. 574, 582 (1960)).  "Generally, the contractual right to compel arbitration may not be invoked by one who is not a party to the agreement and does not otherwise possess the right to compel arbitration."  *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1126 (9th Cir. 2013) (cleaned up).  The "strong public policy in favor of arbitration does not extend to those who are not parties to an arbitration agreement."  *Id*. (cleaned up).

## III. DISCUSSION

### A. Whether Young Agreed to the Exodus Terms of Service

Defendants have not carried their burden to show that Young agreed to the Exodus TOS containing the arbitration agreement that they seek to enforce.  As Defendants concede, the issue of whether Young formed an agreement to arbitrate is for the Court to determine.  (Dkt. No. 78 ("Mot.") at 15.)[2]  "[T]he issues reserved to the courts for decision 'always include' whether an arbitration agreement was formed, even in the presence of a delegation clause."  *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1030 (9th Cir. 2022) (quoting *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010)).

Defendants did not present evidence that Young had actual knowledge of the arbitration agreement contained in the Exodus TOS.  Instead, Defendants argue that Young was on inquiry notice to look at the TOS when he downloaded the Exodus platform software.  "[A]n enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms."  *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022).  To assess whether a notice of terms is "reasonably conspicuous," the Court must examine the "font size and format" to determine if "a reasonably prudent Internet user would have seen it."  *Id*.

The Court grants Defendants' request for judicial notice of the screenshots of Exodus's

---

[2] Citations to page numbers refer to the ECF pagination.

6

website from August 2021, when Young first bought the SOL tokens at issue. *See Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1061 (N.D. Cal. 2021) (taking judicial notice of archived webpages obtained through the Wayback Machine). But the screenshots do not demonstrate whether Young received reasonably conspicuous notice of the Terms of Service or that he manifested his assent to those terms. The notice on which Defendants rely applies only to a desktop download of the Exodus software. (McGill Decl., Ex. A.) No such notice appears in the portion of the screenshot for mobile downloads. (*Id.*) There is no evidence as to whether Young accessed the Exodus platform through a mobile download, desktop download, or some other method. Nor is there any evidence of when he downloaded the Exodus software, which he could have downloaded significantly earlier than the transactions at issue and thus at a time before the July 1, 2021 Terms of Service were in place.

Defendants have simply not carried their burden of proof to show contract formation, and the motion to compel arbitration fails on that basis alone. For the reasons detailed below, Defendants' request for limited discovery on Young's agreement to the Exodus TOS is denied as well, because even if Young had agreed to the Exodus TOS, it would not provide a basis to compel him to arbitrate his claims against Defendants.

### B. Whether Young Agreed Arbitrate Arbitrability with Nonsignatories to the Exodus TOS

Defendants argue that, in the Exodus TOS, Young agreed that an arbitrator, rather than the court, would decide any questions about whether Defendants may enforce the arbitration agreement against Young. Although Young may have agreed to arbitrate arbitrability with Exodus, Defendants have not provided clear and unmistakable evidence that Young agreed to arbitrate arbitrability with *them* as nonsignatories.

The law presumes that parties do not agree to have an arbitrator decide the validity and enforceability of an arbitration agreement, absent clear and unmistakable evidence that they so agreed. "Whether parties have agreed to submit a particular dispute to arbitration is typically an issue for judicial determination," as one of "contract formation." *Granite Rock Co.*, 561 U.S. at

298 (cleaned up). "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (cleaned up). This applies a "heightened standard" to assessing whether a party agreed to arbitrate arbitrability. *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 70 n.1 (2010). "In this manner the law treats silence or ambiguity about the question '*who* (primarily) should decide arbitrability' differently from the way it treats silence or ambiguity about the question '*whether* a particular merits-related dispute is arbitrable because it is within the scope of a valid arbitration agreement'—for in respect to this latter question the law reverses the presumption." *First Options*, 514 U.S. at 944–45 (emphasis in original, citations omitted). As the Supreme Court has noted, arbitration of arbitrability is an "arcane" issue, and "[a] party often might not focus upon that question or upon the significance of having arbitrators decide the scope of their own powers." *Id.* at 945. Silence or ambiguity is insufficient to establish an agreement to delegate that issue to an arbitrator, because "doing so might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide." *Id.*

*Kramer v. Toyota Motor Corp.*, 705 F.3d 1122 (9th Cir. 2013), is instructive. There, the plaintiffs entered into an arbitration agreement with a dealership when they bought their cars, and then sued the manufacturer, Toyota, for alleged defects in the antilock braking system. *Id.* at 1124. Toyota moved to compel arbitration, despite not being a signatory to the arbitration agreement, on the basis that the agreement applied broadly to "all claims and disputes arising out of, or relating to: the vehicle." *Id.* Toyota argued that the plaintiffs had agreed to arbitrate Toyota's ability to enforce the agreement as a nonsignatory because the arbitration agreement provided that it "applies to any claim or dispute about the interpretation or scope of this Arbitration Clause" and "any claim or dispute about whether a claim or dispute should be determined by arbitration." *Id.* at 1125. The Ninth Circuit affirmed the denial of the motion to compel arbitration, holding that "the arbitration agreements do not contain clear and unmistakable evidence that Plaintiffs and Toyota agreed to arbitrate arbitrability." *Id.* at 1127.

8

"While Plaintiffs may have agreed to arbitrate arbitrability in a dispute with the Dealerships, the terms of the arbitration clauses are expressly limited to Plaintiffs and the Dealerships." *Id.* Although the arbitration agreement broadly described the scope of claims subject to arbitration as including "all claims relating to the vehicle," it described the *parties* to the agreement as limited to the plaintiffs and the dealership: "Either you or we may choose to have any dispute between you and us decided by arbitration." *Id.* The court therefore concluded that there was no "clear and unmistakable evidence that Plaintiffs agreed to arbitrate arbitrability with nonsignatories." *Id.*

Similar logic applies to this case. Under the heading "Applicability of Arbitration," the Exodus TOS broadly describes the types of claims subject to arbitration as "any dispute or claim relating in any way to your access or use of the Site." (McGill Decl., Ex. B at 7.) However, the TOS itself is described as a "binding legal agreement between you and Exodus," and the TOS repeatedly identifies the *parties* with whom arbitration would be required as "You" and "Exodus." (*Id.* at 2.) For example, the TOS states on the first page that its terms contain an arbitration agreement that will "REQUIRE DISPUTES BETWEEN YOU AND EXODUS TO BE SUBMITTED TO BINDING AND FINAL ARBITRATION." (*Id.*)

The specific provisions of the arbitration agreement likewise repeatedly refer to the agreement as being between "you" and "Exodus." The first line of the arbitration agreement states: "Please read this Section 10 (the "Arbitration Agreement") carefully. It requires you to arbitrate disputes with Exodus and limits the manner in which you can seek relief." (*Id.* at 6.) Similarly, the provision waiving the right to sue in court and requiring arbitration states: "YOU AND EXODUS HEREBY WAIVE ANY CONSTITUTIONAL AND STATUTORY RIGHTS TO SUE IN COURT," and "You and Exodus are instead electing that all claims and disputes will be resolved by arbitration." (*Id.* at 8.) The authority of the arbitrator is described in like terms: "The arbitration will decide the rights and liabilities, if any, of you and Exodus. The arbitration proceeding will not be consolidated with any other matters or joined with any other cases or parties." (*Id.* at 7.) "The award of the arbitrator is final and binding upon you and us."

9

(*Id.*)  Also notable is that the class action waiver agrees not to seek monetary or other relief "in any lawsuit filed against Exodus."  (*Id*.)

Although these repeated statements are not quite as unequivocal as the one in *Kramer* regarding parties to be bound, they still prevent the conclusion that Young clearly and unmistakably agreed to arbitrate arbitrability with nonsignatories.  The arbitration agreement is twice described – on the first page of the TOS and the first line of the arbitration section – as an agreement to arbitrate disputes with Exodus.  Although the language in Section 10.1 describes the subject matter of the claims to be arbitrated broadly, nothing in Section 10.1 alters the prior provisions about the parties whose disputes are subject to arbitration.  And there is no reason why the arbitration agreement would describe the arbitration as deciding only the rights and liabilities of "you and Exodus," and the arbitral award as being binding only on "you and us," if the intention was to have an arbitration that could address disputes with nonsignatories too.  At best, the arbitration agreement contains conflicting language about whether it applies to nonsignatories.  Defendants counter that the Exodus TOS does not expressly preclude the arbitration agreement's application to nonsignatories.  But that argument turns the presumption against arbitrating arbitrability on its head.  Defendants must show a clear and unmistakable agreement to arbitrate arbitrability with nonsignatories, not the other way around.  *First Options*, 514 U.S. at 944.

Defendants argue that *Kramer* is distinguishable because Young agreed arbitrate the issue of the "enforceability" of the arbitration agreement, whereas the plaintiff in *Kramer* only agreed to arbitrate "whether a claim or dispute should be determined by arbitration."  705 F.3d at 1124.  It is difficult to discern a meaningful distinction between those two phrases, both of which discuss arbitration of arbitrability.  In any event, the use of the term "enforceability" still does not address the fundamental problem:  that the agreement to arbitrate enforceability is as to disputes with Exodus, not disputes with nonsignatories.

The incorporation of the JAMS rules does not cure this defect.  The arbitration agreement provides that disputes "will be subject to JAMS's [rules]."  (McGill Decl., Ex. B at 7.)  The

applicable JAMS rules provide: "Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator." (JAMS Streamlined Arbitration Rule 8(b), *available at* https://www.jamsadr.com/rules-streamlined-arbitration/.) Those rules are silent on the key question of whether Young agreed to arbitrate arbitrability with nonsignatories. Indeed, the provision of the TOS incorporating the JAMS rules supports that arbitration is contemplated only with Exodus, not with nonsignatories:

> If the arbitrator finds that you cannot afford to pay JAMS's filing, administrative, hearing and/or other fees . . . , Exodus will pay them for you. In addition, Exodus will reimburse all such [fees in certain circumstances]. Likewise, Exodus will not seek attorneys' fees and costs in arbitration unless the arbitrator determines the claims are frivolous.

(McGill Decl., Ex. B at 7.) It would, of course, be absurd for Exodus to agree to pay the JAMS fees in an arbitration in which it had no role or involvement. That Exodus agreed to such an arrangement further confirms that the arbitration agreement was limited to disputes with Exodus.

In sum, because the Exodus TOS does not clearly and unmistakably require arbitration of arbitrability with nonsignatories, the question of whether Defendants have formed an agreement to arbitrate with Young is for the Court rather than the arbitrator to determine.

**C.     Enforcement of Arbitration Agreement Based on Equitable Estoppel**

Defendants are not a party to the Exodus TOS and cannot use it as a basis to require Young to arbitrate his claims against them. To "avoid the general rule that one must be a party to an arbitration agreement to invoke it," Defendants must identify some relevant basis in state contract law allowing them to invoke the Exodus TOS as a nonsignatory. *Revitch v. DIRECTV, LLC*, 977 F.3d 713, 716 n.2 (9th Cir. 2020) (cleaned up). Defendants conceded at the hearing on the motion that they are not third-party beneficiaries of the Exodus TOS. Instead, Defendants argue that they are entitled to enforce the agreement based on principles of equitable estoppel

11

under California law.[3]

Equitable estoppel applies when "a signatory must rely on the terms of the written agreement in asserting its claims against the nonsignatory or the claims are intimately founded in and intertwined with the underlying contract." *Kramer*, 705 F.3d at 1128 (cleaned up).[4]  To satisfy that standard, Defendants must show that Young's claims against them "are dependent upon, or inextricably bound up with, the obligations imposed by the contract plaintiff has signed with the signatory defendant." *Id.* (quoting *Goldman v. KPMG LLP*, 92 Cal. Rptr. 3d 534, 550 (Ct. App. 2009)).  The purpose of equitable estoppel is to "prevent[] a plaintiff from having it both ways by seeking to hold a non-signatory liable for obligations imposed by an agreement, while at the same time repudiating the arbitration clause of that very agreement." *Ngo v. BMW of N. Am., LLC*, 23 F.4th 942, 949 (9th Cir. 2022) (cleaned up).

Young's claims against Defendants do not depend on the Exodus TOS and are not inextricably bound up with its terms.  Exodus and its TOS are not mentioned in the operative complaint, and Young does not rely on any of the terms of the Exodus TOS as the basis for his claims that Defendants promoted sales of unregistered securities.

Defendants nonetheless argue that Young's claims depend on the Exodus TOS because Exodus acted as a middleman in Young's purchase of SOL tokens.  But "[t]he California Courts of Appeal have long rejected but-for causation as the relevant standard" for equitable estoppel. *Guisinger v. Keystone RV Co.*, No. 23-55572, 2024 WL 3384211, at *1 (9th Cir. July 12, 2024) (collecting California cases).  *Kramer* is again instructive.  There, the Ninth Circuit, applying California law, rejected the application of equitable estoppel to allow Toyota to compel

---

[3] Young bought the SOL tokens at issue in California, where Solana is located, but the Exodus TOS provides that Delaware law applies.  Defendants request that the Court apply California law because the law of equitable estoppel is materially identical in California and Delaware. (Mot. at 21 n.9.)  Young does not object, and the Court is in agreement with Defendants' analysis.

[4] Equitable estoppel can also apply "when the signatory alleges substantially interdependent and concerted misconduct by the nonsignatory and another signatory and the allegations of interdependent misconduct are founded in or intimately connected with the obligations of the underlying agreement." *Kramer*, 705 F.3d at 1128.  Defendants do not argue that this second basis for equitable estoppel applies here.

arbitration of product defect claims based on the arbitration clause in the plaintiffs' purchase agreements with the dealerships from which they bought the cars. 705 F.3d at 1132. "Toyota is correct that Plaintiffs' claims presume a transaction involving the purchase of a [Toyota vehicle]. The claims do not, however, rely upon the existence of a Purchase Agreement. For illustration, a consumer who purchased a vehicle with cash instead of credit would still state a claim for which relief could be granted, absent a Purchase Agreement." *Id.*; *see also Ngo*, 23 F.4th at 949 (declining to apply equitable estoppel even though "[i]f Ngo had not signed the purchase agreement with the dealership, she would not have been able to purchase her car"); *Guisinger*, 2024 WL 3384211, at *2–3 (same). Young's claims that the SOL tokens he bought were unregistered securities would be the same if he bought the SOL tokens on a different platform or if Exodus had a different TOS. Accordingly, his claims are not "founded in or even tangentially related to any duty, obligation, term or condition imposed by" the Exodus TOS. *Goldman*, 92 Cal. Rptr. 3d at 551.

*Herrera v. Cathay Pac. Airways Ltd.*, 104 F.4th 702 (9th Cir. 2024), on which Defendants rely, offers a useful contrast.[5] The Herreras sued the airline Cathay Pacific for failing to refund their tickets. *Id.* at 706. The Herreras allegedly asked third-party vendor ASAP Tickets, from whom they had bought the tickets, for a refund, but ASAP said that Cathay Pacific would only offer a voucher. *Id.* at 705. The complaint relied on the fact that ASAP's terms and conditions provided that "ASAP has no power to override any fare restrictions set by the airline," which supported the Herreras' view that Cathay Pacific was the one denying the refund. *Id.* at 708. Because the Herreras' claim against Cathay Pacific was "founded in and intertwined with" ASAP's terms and conditions, they were equitably estopped from refusing the comply with the arbitration agreement in those terms and conditions. *Id.* Here, by contrast, Young does not rely on any particular term in the Exodus TOS as a basis for claiming SOL was an unregistered

---

[5] After the close of briefing on the motion to compel arbitration, *Herrera* was amended to reflect the Supreme Court's recent decision that a case must be stayed pending arbitration when requested, rather than dismissed. Defendants cited to the earlier version of *Herrera*, 94 F.4th 1083 (9th Cir. 2024).

security.

Nor does Young's opposition to the motion to dismiss demonstrate that his claims rely on the Exodus TOS, as Defendants contend. (Dkt. No. 98 at 26.) To support that he adequately pleaded a domestic transaction, Young argued that he bought the SOL tokens in California by hitting a "swap" button on the Exodus platform and sought judicial notice of a "how to" page from the Exodus website on completing a trade. (Dkt. No. 88 at 24; Dkt. No. 89-1.) That argument does not rely on the Exodus TOS in any way. If Exodus had a completely different TOS or no TOS at all, the argument would still be the same. Defendants also point to a footnote to Young's opposition to the motion to dismiss: "Here it is irrelevant who the counter party to Plaintiff's transaction is, as irrevocable lability attaches in California, at the push of a button. Nothing in the Exodus terms and conditions suggest a user would know who a counter party would be." (Dkt. No. 88 at 25 n.16.) In other words, Young cited the Exodus TOS to argue that an issue was irrelevant to his claims. That does not suffice to show that Young's claims "intimately rely" on the Exodus TOS. *Kramer*, 705 F.3d at 1132.

Defendants' argument that Young's damages would require knowing how much he paid for the SOL tokens is likewise misplaced. The Exodus TOS does not indicate the price that Young paid for the SOL tokens, so Young's prayer for relief does not rely on the Exodus TOS. In any event, even if it did, "[l]ooking to California contract law, the correct analysis is whether Plaintiffs would have a *claim* independent of the existence of the [Exodus TOS], … not whether the court must look to the [Exodus TOS] to ascertain the requested relief." *Id.* (emphasis in original) (rejecting equitable estoppel based on the plaintiffs' "mere reference" to a "price term" in conjunction with plaintiffs' claim for damages). Defendants may not rely on equitable estoppel to invoke the Exodus TOS to require arbitration of Young's claims.

## IV.    CONCLUSION

Defendants' motion to compel arbitration (Dkt. No. 78) is **DENIED**. As the parties requested at the hearing, the Court will not rule on the motions to dismiss at this time, to allow Defendants to determine if they wish to seek an immediate appeal of this Order under 9 U.S.C.

14

§ 16.  The motions to dismiss (Dkt. Nos. 76, 80) are **DENIED WITHOUT PREJUDICE** to being renewed by re-noticing them following completion of any appeals.  Defendants' deadline to respond to the operative complaint is also **<u>STAYED</u>** until 21 days after the time to appeal this Order has elapsed or, if an appeal is taken, after all appeals have been completed.

  **IT IS SO ORDERED.**

Dated: September 3, 2024

                    RITA F. LIN
                    United States District Judge